**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-6**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALEJANDRO ENRIQUE RAMIREZ UMAÑA, a/k/a Wizard, a/k/a Lobo,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.   Robert J. Conrad, Jr., District Judge.  (3:08-cr-00134-RJC-2)

Argued:  January 28, 2014                    Decided:  April 23, 2014

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

Affirmed by published opinion.   Judge Niemeyer wrote the majority opinion, in which Judge Agee joined.   Judge Gregory wrote a dissenting opinion.

**ARGUED**:  Vincent James Brunkow, FEDERAL DEFENDERS OF SAN DIEGO, INC., San Diego, California, for Appellant.  Adam Christopher Morris, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF**:  Zandra L. Lopez, Janet C. Tung, FEDERAL DEFENDERS OF SAN DIEGO, INC., San Diego, California; Malcom Ray Hunter, Jr., Chapel Hill, North Carolina; David Weiss, COPELEY JOHNSON & GRONINGER PLLC, Durham, North Carolina, for Appellant.   Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

Alejandro Enrique Ramirez Umaña shot and killed two brothers, Ruben and Manuel Salinas, at point-blank range in a restaurant in Greensboro, North Carolina, because Umaña perceived that the brothers had insulted Umaña's gang, Mara Salvatrucha, commonly known as MS-13. A jury convicted Umaña of all counts for which he was charged, including two counts charging him with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and two counts charging him with committing murder while using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) and (j)(1). The convictions on those charges subjected Umaña to a maximum sentence of death.

Following the verdict of conviction, the same jury returned a verdict that Umaña was death eligible on the four capital counts, as provided in 18 U.S.C. §§ 3591-3596. The jury found that two statutory aggravating factors applied: (1) that Umaña had created a grave risk of death to one or more persons in addition to each victim, and (2) that he had killed more than one person in a single criminal episode.

Finally, in the sentence selection phase of trial, the jury imposed the death penalty, finding that four additional nonstatutory aggravating factors applied: (1) that Umaña had killed the two brothers to protect and maintain the reputation

2

of MS-13 and to advance his position in that gang; (2) that Umaña had caused injury and loss to the brothers' family and friends; (3) that Umaña had earlier intentionally committed several murders in Los Angeles; and (4) that Umaña posed a continuing and serious threat to the lives and safety of others, as evidenced by his lack of remorse, his allegiance to MS-13, his lack of rehabilitation, and his pattern of violence. The jury also found several mitigating factors. After weighing the aggravating and mitigating factors, the jury imposed the death penalty.

On appeal, Umaña challenges every phase of the proceedings below. After carefully considering each of Umaña's arguments, we reject them and affirm the convictions and sentence.

I

Umaña, who was born in El Salvador in the early 1980s, illegally entered the United States in 2004 to live in Los Angeles. At the time, he had been a member of the MS-13 gang for several years, having joined in 2001, while he lived in El Salvador.

MS-13 was formed in Los Angeles in the 1980s by immigrants from Central America, predominantly El Salvador. To gain membership into MS-13, an individual must submit to a 13-second beating. The gang uses violence and extortion to gain and

3

control territory, and for a member to build his reputation in MS-13, he has to be ready to attack rival gang members or anyone else who disrespects the gang.  MS-13 punishes betrayal by putting the "green light" on the member, which constitutes an order that he be targeted for death.

While Los Angeles continues to be the mecca of MS-13 activity, MS-13 has become a transnational organization, with groups, or "cliques," across the United States, in Canada, and in Central America.

Umaña's activities in Los Angeles

During the sentence selection phase of Umaña's trial, the government introduced evidence implicating Umaña in several Los Angeles shootings:  one on Fairfax Street on July 27, 2005, where two persons were shot and killed, and one in Lemon Grove Park on September 28, 2005, where a group of four persons were shot at and one was killed and two were injured.

On the occasion of the Fairfax Street murders, Umaña was in the passenger seat of a car with several other MS-13 members. The car pulled up alongside two males walking down the street, and the two groups began flashing gang signs at one another. The two males on the street were graffiti artists, or "taggers," and they made hand gestures that were perceived as challenging MS-13.  Some or all of Umaña's group exited the car to confront

4

the taggers.  There were conflicting accounts about what happened next.  Umaña's fellow MS-13 members claimed that Umaña shot the two taggers, but two civilian eye witnesses claimed that the driver of the car shot them.

On the occasion of the Lemon Grove Park murder, two men approached a group of four who had just finished playing basketball and were sitting on bleachers in the park.  Without a word, the two men took out guns and opened fire on the group.  One of the four basketball players was killed, while two others were wounded.  The fourth, Freddie Gonzalez, who was apparently the target of the attack, escaped uninjured.  Several pieces of evidence linked Umaña to this murder.  First, Gonzalez identified Umaña in a photo lineup and confirmed the identification in court, although he admitted to some uncertainty.  Also, Umaña admitted to driving the shooters to the basketball court, although he denied being a shooter himself.  Finally, ballistics matched the gun used in the Fairfax Street murders with the gun used in the Lemon Grove Park murder, and there was no evidence that anyone but Umaña was present at both crime scenes.

## Umaña's New York activities

Umaña left Los Angeles and, by the summer of 2007, was residing in New York.  By this time, he had built up a

substantial reputation within MS-13. One witness recalled that Umaña, who had taken on the moniker of "Wizard," was treated by his fellow gang members like he was "big time."

In the fall of 2007, an MS-13 leader in New York directed Umaña to travel to Charlotte, North Carolina, as the Charlotte MS-13 cliques had been experiencing significant infighting. Because of his experience and exposure to gang life in Los Angeles, Umaña was ordered to "set them straight" in North Carolina. This was confirmed by a Charlotte-based MS-13 member who stated that it was expected that Umaña would "take control" because he knew "how to run a gang."

Umaña's North Carolina activities

When he arrived in North Carolina, Umaña convened a meeting, during which he instructed the MS-13 members as to how they should be extorting money, selling drugs, and stealing cars. He inspected the gang members' guns; he emphasized to them the importance of respect; and he told them to merge the Charlotte cliques together. Over the course of the following months, Umaña conducted numerous meetings with MS-13 members in Charlotte.

On December 8, 2007, Umaña was in Greensboro, North Carolina, having dinner with several fellow MS-13 members at Las Jarochitas, a Mexican food restaurant. Also at the restaurant

6

were Ruben and Manuel Salinas, regulars at Las Jarochitas, who were eating and drinking with several other men. The Salinas brothers were not affiliated with any gang.

Umaña and his associates were sitting near the jukebox, and they began selecting songs. This upset Manuel Salinas, who liked to listen to "corrida," a type of Mexican country music, whenever he visited Las Jarochitas. As one witness reported, the two groups then began "arguing and kind of like pushing each other." Perhaps fearing that the situation was getting out of hand, Manuel Salinas tried to calm things down by buying the MS-13 members a bucket of beers. The MS-13 members, however, rebuffed the peace offering, refusing to drink or even acknowledge the beers.

A concerned waitress asked the MS-13 members to leave the restaurant. As they were filing out, the groups were "exchanging words," and Ruben Salinas told the MS-13 members that he "wasn't scared of them." The gang members responded that Ruben Salinas should not "mess with them" because "they were from . . . MS." Ruben retorted that the gang was "fake to him."

All of the MS-13 members left the restaurant except for Umaña, who stayed behind. Upon realizing that Umaña was still in the restaurant, an MS-13 member named Spider came back inside. When the waitress tried to pull Umaña to the door,

Spider grabbed her and told her not to touch him. It was at this point that Umaña pulled out his gun and pointed it at Ruben and Manuel, but he did not shoot right away. He held his gun sideways, while Manuel and Ruben stood motionless. No one said anything. After some time elapsed, perhaps as much as a minute, Umaña fired five shots at the brothers. Ruben received a gunshot wound to the chest, and Manuel was shot in the head. Both were pronounced dead at the scene of the crime. A third individual was shot in the shoulder and survived.

Witnesses identified Umaña as the shooter, and Umaña does not contest that he pulled the trigger.

Immediately after the murders, Umaña's group contacted a fellow MS-13 member, who had been serving as a confidential informant, to help them get back to Charlotte that night. The informant met Umaña and the other gang members at an IHOP restaurant between Charlotte and Greensboro. Umaña switched cars and rode with the informant back to Charlotte. During the ride, he was cocking and uncocking his gun and discussing its bullets. Their first stop was a nightclub and nearby taco stand outside of Charlotte, where Umaña told the confidential informant to smell the gun, because it smelled like gunpowder from being fired. Umaña also told the informant that he was going to "pee on [his] hands" to get rid of the gunpowder. Several other MS-13 members had congregated at the taco

8

restaurant.   One  MS-13  member  later  recounted  Umaña's explanation  for  why  he  had  committed  the  murders  --  "[Umaña] said  they  insulted  the  MS-13.   And  he  was  doing  it  not  only because  of  him,  because  he  was  doing  it  because  of  us,  too."   Of the  third  victim,  Umaña  lamented  that  he  "didn't  kill  that  son of  a  bitch."   When  asked  about  the  prospect  of  being  pulled  over by  the  police  with  the  murder  weapon,  he  responded,  as  recorded on  tape,  that  the  officer  would  be  on  the  wrong  end  of  his  gun, as  "she  is  always  close  by."

Charlotte  police  arrested  Umaña  at  an  MS-13  member's  house on  December  12,  2007.   The  police  found  the  murder  weapon  in  the sofa  where  Umaña  was  sitting.   Umaña  later  told  other  MS-13 members  that  the  police  were  "lucky"  because  he  had  been  "trying to  grab  for  his  gun."

Procedural history

While  Umaña  was  being  held  in  custody  by  North  Carolina authorities,  several  Los  Angeles  police  detectives  interrogated him  about  the  shootings  that  had  occurred  in  Los  Angeles.   Umaña denied  committing  those  murders,  although  he  did  admit  to  being present  or  nearby  when  they  occurred.

Two  months  later,  a  federal  grand  jury  in  Charlotte,  in  the Western  District  of  North  Carolina,  indicted  Umaña  for  the murders  committed  in  Greensboro,  which  is  in  the  Middle  District

of North Carolina.  Umaña filed a motion to dismiss the indictment for improper venue, which the district court denied. He also requested a hearing pursuant to Atkins v. Virginia, 536 U.S. 304 (2002), which forbids execution for mentally retarded defendants.  The court granted the Atkins hearing and found that Umaña had failed to prove his disability by a preponderance of the evidence.

While in prison awaiting trial, Umaña maintained contact with MS-13 members.  He wrote lengthy letters expressing his continuing loyalty to the gang and his hatred for his enemies. His letters also gave orders to execute rivals and intimidate potential witnesses against him.  While the letters were encoded, the FBI broke the code.

The case proceeded to trial.  On the first day of jury selection, U.S. Marshals frisked Umaña and discovered that he had tied a four-inch metal blade (in a paper sheath) to his penis.  And when the confidential informant testified during trial, Umaña flashed MS-13 gang signs with his hands and, as the informant was leaving, said in Spanish, "[Y]our family's going to pay you mother--."  This threat took place in front of the jury.

The jury convicted Umaña on all counts.  It found him guilty of conspiring to conduct, or to participate in the conduct of, the affairs of an enterprise affecting interstate

commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (prohibiting RICO conspiracy). It found that this RICO conspiracy included the "willful, deliberate and premeditated murder" of the Salinas brothers, in violation of N.C. Gen. Stat. § 14-17. The jury also found Umaña guilty of murdering the Salinas brothers in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). Finally, the jury found Umaña guilty of using a firearm in relation to a crime of violence, resulting in the death of the Salinas brothers, in violation of 18 U.S.C. § 924(c) and (j)(1). The jury also found Umaña guilty of several lesser offenses not at issue here, including being an alien in possession of a firearm, robbery affecting interstate commerce, and witness tampering.

The government sought the death penalty for the § 1959 and § 924 counts. Accordingly, the district court divided the trial into three phases -- the first to determine guilt or innocence; the second to determine Umaña's eligibility for the death penalty; and the third, if Umaña were found death eligible, to select between the death penalty and life imprisonment without the possibility of release.

After finding Umaña guilty, the jury found him eligible for the death penalty under the Federal Death Penalty Act, 18 U.S.C. §§ 3591-3596. In addition to finding that, during the commission of the crimes, Umaña was of sufficient age and had a

11

sufficiently culpable state of mind, it found that two statutory aggravating factors applied. First, it found that Umaña had created a grave risk of death to one or more persons in addition to each victim, and second, it found that he had killed more than one person in a single criminal episode.

After the jury found Umaña eligible for the death penalty, the court proceeded to the sentence selection phase, during which the government put on evidence to prove four additional nonstatutory aggravating factors: (1) that Umaña had killed the Salinas brothers to protect and maintain the reputation of MS-13 and to advance his position therein; (2) that Umaña had caused injury and loss to the Salinas brothers' family and friends; (3) that Umaña had intentionally committed several murders in Los Angeles; and (4) that Umaña posed a continuing and serious threat to the lives and safety of others, as evidenced by his lack of remorse, his allegiance to MS-13, his lack of rehabilitation, and his pattern of violence. The jury found the existence of all four aggravating factors unanimously and beyond a reasonable doubt. They also considered the evidence presented by Umaña in mitigation, which consisted primarily of (1) the effects that Umaña's upbringing had on his culpability; (2) videos of his family and friends; and (3) testimony about safety precautions that would be in place should Umaña be sentenced to life imprisonment. All or some of the jury members found that

12

Umaña had proved various mitigating factors by a preponderance of the evidence. In particular, they found that the murder occurred during an emotionally charged argument and that the murder occurred as a result of Umaña's indoctrination into the ways and thinking of MS-13. After weighing the aggravating and mitigating circumstances, the jury sentenced Umaña to death.

This appeal followed, raising numerous challenges, as discussed herein.

II

Umaña challenges first the venue of his trial in the Western District of North Carolina. He contends that "venue on the capital counts [Counts 22-25] was proper only in the Middle District of North Carolina [in Greensboro], where the killings occurred because 'murder' was the only essential 'conduct' element of the charged offenses (violations of 18 U.S.C. § 1959 and §§ 924(c) & (j)(1))," and that venue was not proper in the Western District of North Carolina, where he was tried. He argues that committing murder "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity," as punished by § 1959, has only one conduct element -- that of committing murder -- and that the element of maintaining or increasing position in a racketeering enterprise is a <u>mens</u> <u>rea</u> element. He points out that under

13

established venue jurisprudence, a mens rea element does not contribute to determining the locus delicti of the crime, i.e., where it was committed for venue purposes. See United States v. Jefferson, 674 F.3d 332, 366-68 & n.46 (4th Cir. 2012); United States v. Oceanpro Indus., Ltd., 674 F.3d 323, 329 (4th Cir. 2012). He further argues that venue was improper for the trial of the two § 924 counts because those counts depended on the two § 1959 counts.

The government contends that venue in the Western District was proper because the murders were committed by Umaña in "connection to the 'racketeering enterprise' and RICO conspiracy," which were "continuing offense[s] centered in Charlotte," in the Western District. It argues that just as murder was an essential conduct element, so too was the racketeering activity with which the murders were necessarily connected, justifying venue in either the Western or Middle Districts.

Both the Constitution and the statutes implementing it require that criminal trials be conducted where the crime was "committed." See U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; 18 U.S.C. §§ 3235-3237; Fed. R. Crim. P. 18. The place where a crime is committed -- the locus delicti -- "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v.

14

Rodriguez-Moreno, 526 U.S. 275, 279 (1999) (quoting United States v. Cabrales, 524 U.S. 1, 6-7 (1998)).  Thus, to determine venue, we must first "identify the conduct constituting the offense" and then "discern the location of the commission of the criminal acts."  Id.  The location of the criminal acts is determinative.  See Jefferson, 674 F.3d at 365; Oceanpro, 674 F.3d at 328; United States v. Bowens, 224 F.3d 302, 311 (4th Cir. 2000).  Of course, if the criminal conduct spans multiple districts, the crime may be tried in any district in which at least one conduct element was committed.  See 18 U.S.C. § 3237(a); Rodriguez-Moreno, 526 U.S. at 281.

Counts 22 and 24 of the indictment charged Umaña with the murders of Ruben Salinas and his brother, Manuel Salinas, in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1), and venue for trial of those offenses lay where the essential conduct elements of the § 1959 offense were committed.

In order to establish murder in aid of racketeering activity under § 1959, the government must show:

    (1)   that there was an enterprise engaged in racketeering activity;

    (2)   that the enterprise's activities affected interstate commerce;

    (3)   that the defendant committed murder; and

    (4)   that the defendant, in committing murder, acted in response to payment or a promise of payment by

15

> the enterprise or "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise."

18 U.S.C. § 1959(a)(1); see also United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994).

Umaña argues that the only conduct element of the § 1959 offense was the murder itself. He characterizes the language linking the murder to the racketeering enterprise -- i.e., "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity" -- as merely descriptive of the crime's requisite mens rea, which cannot determine where the crime was committed for venue purposes. See Oceanpro, 674 F.3d at 329.

We decline to read that element so narrowly. We think that "for the purpose of . . . maintaining or increasing position in an enterprise" defines a motive element that includes a requirement that the defendant have interacted with the enterprise with respect to his purpose of bolstering his position in that enterprise. Such activity could occur before commission of a violent crime covered by the statute -- for example, if a mafia boss instructed a member to commit murder or else be cast out of the organization -- or after commission of a violent crime -- for example, if the member returned to mafia headquarters to boast about his exploits with a mind toward advancement.

16

Two reasons underlie our interpretation.  First, we think this reading avoids the illogical -- and possibly unconstitutional -- result that § 1959 would criminalize a murder committed with a secret intent to join a gang where the murderer has absolutely no prior connection with the gang itself.  Congress made clear, when enacting § 1959, that the offense was aimed at eliminating violent crime "committed as an integral part of an organized crime operation."  S. Rep. No. 98-225, at 305 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3485 (emphasis added).  And a physical manifestation of purpose is necessary to ensure that the act is actually carried out to further the enterprise's goals.

Second, the statutory context suggests that the "for the purpose of" prong requires a manifest quid pro quo between the member and the gang.  The earlier, parallel portion of the statute criminalizes violent crime conducted "as consideration for the receipt of" or "as consideration for a promise or agreement to pay . . . anything of pecuniary value."  18 U.S.C. § 1959(a).  This portion of the statute clearly indicates that there must be a reciprocal arrangement between the enterprise and the individual, and we believe it sensible to read the "for the purpose of" language similarly.

At bottom, we hold that § 1959(a)(1) includes as an element an objective, physical act that links the defendant with the

17

enterprise with respect to the underlying violent crime and that this element is a conduct element supporting venue.

In this case, Umaña's actions in Charlotte were sufficient to satisfy this conduct element. Umaña was sent to Charlotte with orders to shape up the North Carolina cliques. Upon arriving in Charlotte, he instructed the local MS-13 members at length about weapons and ammunition. He passed around his own gun. He discussed maintaining respect. One witness, who was at the initial Charlotte meeting, testified that respect "was everything" to Umaña. And after killing the Salinas brothers for their failure to respect his gang, Umaña immediately returned to Charlotte, where he boasted to his fellow MS-13 members about the murders. He told them that he had killed the Salinas brothers because they had insulted MS-13 and that he had killed them for his fellow gang members. These objective manifestations of Umaña's purpose to further his position in the enterprise were sufficient to support venue in the Western District of North Carolina for the § 1959 prosecution.

In Counts 23 and 25, Umaña was charged and tried for violations of 18 U.S.C. § 924(c) and (j)(1). The indictment in those counts alleged that Umaña used a firearm "during and in relation to a crime of violence, that is: conspiracy to participate in a racketeering enterprise [18 U.S.C. § 1962] and murder in aid of racketeering [18 U.S.C. § 1959]," resulting in

18

the unlawful killing of Ruben and Manuel Salinas.  Venue for § 924(c) prosecutions is appropriate wherever the underlying crime of violence took place.  Rodriguez-Moreno, 526 U.S. at 281.

Umaña does not dispute that venue was proper in the Western District of North Carolina for the underlying § 1962 prosecution and, as we are holding, venue was also appropriate there for the § 1959 prosecution.  Thus, regardless of which predicate crime of violence the jury relied on, venue for the § 924(c) counts was appropriate in the Western District.

III

Umaña next contends that his convictions on Counts 22 and 24 for murder in aid of racketeering activity under 18 U.S.C. § 1959(a)(1) punished conduct that "is a quintessential, noneconomic, local activity that lies beyond Congress's authority to regulate under the Commerce Clause," much like the activity regulated in the Violence Against Women Act, which the Supreme Court struck down in United States v. Morrison, 529 U.S. 598 (2000).  Moreover, he asserts, requiring that the murder be committed to maintain or further one's status in "a street gang fails to change its noneconomic nature."  And because his convictions on Counts 23 and 25 under § 924(c) were predicated on his § 1959 convictions, Umaña reasons that they too exceeded

19

the government's Commerce Clause authority.  Accordingly, he argues that his convictions on Counts 22 through 25 must be reversed.

Because Umaña failed to present this argument to the district court, we review it for plain error.  See United States v. Forrest, 429 F.3d 73, 77 (4th Cir. 2005) (conducting a plain error review of a Commerce Clause challenge that was not raised before the district court).

Article I, § 8, of the U.S. Constitution authorizes Congress to make laws as necessary to regulate commerce among the States so long as it has a "'rational basis' . . . for . . . concluding" that the prohibited activities, "taken in the aggregate, substantially affect interstate commerce."  Gonzalez v. Raich, 545 U.S. 1, 22 (2005).

Section 1959(a) punishes violent crimes, including murder, committed "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity," with the term "enterprise" defined to include "any partnership, corporation, association, or other legal entity . . . which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1959(a), (b)(2).  The question therefore is whether Congress could rationally have concluded that intrastate acts of violence, such as murder, committed for the purpose of maintaining or increasing one's status in an

20

interstate racketeering enterprise, would substantially affect the interstate activities of that enterprise. We conclude that it could have.

We find it wholly reasonable to believe that members of a criminal enterprise might engage in violence to solidify their status in the organization or rise in the ranks of its leadership, and that by doing so, they would enhance the power and reach of the racketeering enterprise itself. Indeed, the circumstances of the present case provide a convenient illustration. Because of Umaña's substantial reputation in MS-13, which he seems to have built up partly through acts of violence in Los Angeles, MS-13 leadership -- through international telephone calls -- sent him from New York to North Carolina to instruct the cliques there on how more effectively to deal drugs, steal cars, and extort money. Congress could rationally have concluded that proscribing reputation-enhancing violence committed by members of a criminal enterprise would disrupt the interstate commerce that the enterprise itself engages in. Accord United States v. Crenshaw, 359 F.3d 977, 986 (8th Cir. 2004) (upholding the constitutionality of § 1959 under the Commerce Clause, noting that "[i]t seems . . . clear that criminal enterprises use violence or the threat of violence in connection with their commercial activities"); see also United States v. Nascimento, 491 F.3d 25, 43 (1st Cir. 2007) ("Given

21

the obvious ties between organized violence and racketeering activity -- the former is a frequent concomitant of the latter -- we defer to Congress's rational judgment, as part of its effort to crack down on racketeering enterprises, to enact a statute that targeted organized violence").  Indeed, Congress reached just such a conclusion when it observed that murders, assaults, and other crimes proscribed by § 1959 constituted an "integral aspect of membership in an enterprise engaged in racketeering activity."  S. Rep. No. 98-225, at 304, reprinted in 1984 U.S.C.C.A.N. at 3483.

Moreover, § 1959 includes a jurisdictional element that limits its reach to activities connected with enterprises "engaged in" or whose activities "affect" interstate commerce, thereby justifying its constitutionality under the Commerce Clause.  18 U.S.C. § 1959(a), (b)(2); see also United States v. Gibert, 677 F.3d 613, 624 (4th Cir. 2012).  This jurisdictional element distinguishes § 1959 from the Violence Against Women Act struck down in Morrison.  529 U.S. at 613.  In Morrison, the Supreme Court explicitly noted the lack of a limiting jurisdictional element that would have confined the statute to those activities actually affecting interstate commerce.  Id. (noting that the Gun-Free School Zones Act, which was struck down in United States v. Lopez, 514 U.S. 549 (1995), and the Violence Against Women Act at issue in Morrison "contain[ed] no

jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"). But § 1959 does have a limiting jurisdictional element that confines its reach to crimes that affect interstate commerce.

Umaña argues further that the application of § 1959 to his particular circumstances is unconstitutional because "the murder here had no effect on interstate commerce, was non-commercial in nature, and was unrelated to organized interstate trafficking efforts in drugs or other contraband." But such an argument is of no consequence to the Commerce Clause analysis, which does not focus on whether particular conduct under the statute had an impact on interstate commerce, but rather on whether "the class of acts proscribed had such an impact." Gibert, 677 F.3d at 627; see also Raich, 545 U.S. at 17 ("[W]hen a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence" (quoting Lopez, 514 U.S. at 558) (internal quotation marks omitted)); United States v. Gould, 568 F.3d 459, 475 (4th Cir. 2009); United States v. Williams, 342 F.3d 350, 355 (4th Cir. 2003).

Accordingly, we find no error, let alone plain error, and therefore we reject Umaña's Commerce Clause challenge.

Umaña contends that the district court abused its discretion in refusing to excuse Jurors 286 and 119 on account of their personal bias. He argues that Juror 286 was biased based on a past life experience with respect to a crime committed against her brother and that Juror 119 was biased as indicated by the answers she gave about whether she could meaningfully consider life imprisonment, in lieu of death, upon a finding of guilt on the charges in this case.

We review the district court's decisions to seat these jurors for abuse of discretion, Poynter v. Ratcliff, 874 F.2d 219, 222 (4th Cir. 1989), and we will find abuse only "where a per se rule of disqualification applies" or "where the [trial] court 'demonstrate[d] a clear disregard for the actual bias' of the juror," United States v. Fulks, 454 F.3d 410, 432 (4th Cir. 2006) (quoting United States v. Turner, 389 F.3d 111, 115 (4th Cir. 2004)).

A

Juror 286 recounted during voir dire that more than 30 years earlier, her brother had been the victim of an attempted murder; that the assailant received a short sentence; and that, after release, the assailant committed murder and then suicide. Based on this life experience and on Juror 286's answers during

voir dire, Umaña argues that the district court should have found that Juror 286 was <u>actually</u> biased or that, based solely on her life experience, she was in any event <u>impliedly</u> biased.

During voir dire, the prosecutor asked Juror 286 several questions about her ability to dispense penalties impartially:

Q:  And are you able to keep an open mind until you've heard the evidence to make [the decision between life in prison and the death penalty] together with the other jurors?

A:  I would like to think so.  I mean, I don't know anything about the case.

Q:  And that's the point.  But you haven't heard the evidence, so are you able to keep an open mind and consider both options at the conclusion of the evidence?

A:  I think so.

*      *      *

Q:  And given the information that you shared about the tragedy with your brother . . . , are you able to come into this courtroom and consider only the facts and evidence that are presented in this case in making your decision?

A:  I hope that I can.  I mean, I can't forget those . . . experiences that I've had. . . .  I would hope, and I think that I would look at the facts of this case.

*      *      *

Q:  All right.  And so as you sit here today . . . until you've heard all the facts in evidence in this case, you would be able to fairly consider both potential punishments; life imprisonment without parole and the death penalty?

A:  Yes.

25

Umaña's counsel followed up on Juror 286's answers with the following inquiry:

Q: Does [your frustration with how your brother's case was handled] come into play now, if you're a juror in a case like this, that involves two charges of murder?

A: I don't know if it would or not, to be honest. I do have strong feelings about it. You know, the sentence -- the sentence to me did not -- it was not justified, based on the circumstances and what happened. And that person, because he didn't have a sufficient sentence, I think, initially, went on to do additional murder and suicide. And yeah, I do have a problem getting past that.

Then, after Umaña's counsel explained to Juror 286 that, upon a finding of guilt for murder, there would be only "two options on the table" -- life without the possibility of release and death -- he questioned her as follows:

Q: Knowing that, does your attitude about your frustration with the judicial system and the sentence that that assailant of your brother's got, how -- can you tell us whether that would be an issue or affect you?

A: I think it's a bit different than the situation with my brother. Because in that instance I just didn't think that there was sufficient punishment that fit the crime. In this case you're looking at the death penalty, or as you're telling me, someone who would be in prison the rest of their life. It's different, and I hope that I would see that.

* * *

Q: Are you saying then, that . . . you would consider equally, or give fair consideration to

26

> both types of sentences? In other words, that
> you would think that either death or life without
> parole would be considered as sufficient
> sentences for those crimes?
>
> A: I think depending on the circumstances and the
> evidence.
>
> Q: . . . [W]ould you meaningfully consider both of
> these sentencing options in the sentencing phase
> of this trial?
>
> A: Yes. Yes.
>
> \* \* \*
>
> Q: [D]o you think that the experience with what
> happened to your brother's attacker and
> everything, would have any impact on your ability
> to be a fair judge on the facts, as far as . . .
> guilty versus not guilty?
>
> A: . . . I would hope it would not enter into my
> decision, but I still have that experience.
>
> Q: . . . [T]he defendant has the right, as does the
> government, to have a jury of people who are fair
> and impartial and open-minded. And I guess, do
> you feel that you are one of those people right
> for this case?
>
> A: I don't know if I can say 100 percent. I really
> don't.

At that point, the district judge intervened to describe to Juror 286 the presumption of innocence and to explain that the government bears the burden of proof. The judge then asked the following questions:

> Q: Now, is there anything about your life experience
> that keeps you from understanding those
> principles and agreeing to apply them in this
> case?

27

A:    I understand the principles entirely.  And I hope
      that I could, you know, . . . do the job that's
      requested.  I just . . . have these things in my
      experience that I don't know whether they would
      prevent me from doing the job correctly or not.

Q:    Do you agree with those principles?

A:    Yes, I do.

                    *       *       *

Q:    And is there anything about your past experience
      that would prevent you from meaningfully
      participating in that process [of determining the
      penalty options]?

A:    No, I don't think so.

The judge then declined to excuse Juror 286.

Based on Juror 286's answers, Umaña argues that Juror 286 displayed actual bias because she "remained equivocal regarding whether the circumstances surrounding the attempt on her brother's life would affect her ability to keep an open mind and be a fair and impartial juror during the guilt/innocence phase." Thus, he contends that there remained uncertainty after voir dire "about whether she could actually apply [the presumption of innocence and proof beyond a reasonable doubt] in light of her past experiences."  He suggests that United States v. Thompson, 744 F.2d 1065 (4th Cir. 1984), required a finding that Juror 286 was actually biased.

In Thompson, one of the jurors notified the judge during trial that a piece of evidence had "moved [him] quite heavily."

28

744 F.2d at 1067. When the judge told the juror that he wanted to make sure that the juror still had an open mind, the juror responded, "I don't think that I do. . . . I am not sure that I could be totally fair. I would try to be as much as I could, but I am just not sure I could be totally fair." Id. (emphasis added). After denying a motion for a mistrial, the judge asked the juror if he could keep an open mind and maintain the presumption of innocence, and the juror responded, "I will try. I am not sure, your Honor." Id. at 1067-68. We found that the trial court had abused its discretion by declining to excuse the juror, and we held that "after [the juror] gave an equivocal response to repeated questions about his ability to proceed with an open mind . . . the trial court should have asked for an affirmative response." Id.

The circumstances in Thompson, however, were different in kind and effect from those here. In Thompson, the juror had suggested that he was unable to be fair. When asked whether he had an open mind, the juror said, "I don't think that I do." By contrast, Juror 286 left the court with the opposite message, suggesting that she "would like to think" that she could keep an open mind. Moreover, when the judge asked Juror 286 whether she agreed with the basic constitutional principles relating to the presumption of innocence and the government's burden of proof, she said that she did. She also told the judge that her past

29

experiences would not prevent her from "meaningfully participating in [the sentencing] process." To be sure, Juror 286 stated that she could not be 100% sure about how she would conduct herself, but nonetheless she repeatedly stated that she thought she could keep an open mind and "look at the facts of this case."

We similarly distinguished Thompson in United States v. Hager, 721 F.3d 167 (4th Cir. 2013), where a juror expressed some equivocation about whether he could be impartial. In Hager, the judge interrogated the juror at length, asking, for example, whether the juror could "give effect to those two instructions [regarding the presumption of innocence and burden of proof]," and the juror answered, as did Juror 286 in this case, "Yes, I would try." 721 F.3d at 190-91. The court followed up this inquiry by asking, "[I]s there any reason why you wouldn't succeed?" to which the juror responded, "No, I wouldn't think [so]." Id. at 191. The Hager court found that the judge had not abused his discretion by seating the juror, distinguishing the circumstances from Thompson in this way:

> Although Juror 144 and the juror in Thompson both initially stated only that they would try to be fair, the district court here followed up by asking if there was any reason that the juror could not be fair. And each time that question was posed, Juror 144 said that there was not. The district court in Thompson, however, failed to solicit such a response.

30

Id. at 192; see also United States v. Capers, 61 F.3d 1100, 1104-05 (4th Cir. 1995) (finding no abuse of discretion where a trial judge refused to excuse a juror who stated that he "might favor the government").

We conclude that the district judge in the present case did not abuse his discretion by declining to find that Juror 286 was actually biased. A juror need not express unflinching certainty for a trial judge to determine that she will be able to remain impartial. See, e.g., Hager, 721 F.3d at 191-92. Moreover, in this case, the judge took care by repeatedly asking, in follow-up questions, whether Juror 286 could be fair and impartial. Juror 286 affirmed without qualification that she agreed with the principles that defendants are presumed innocent and that the government has the burden of proof, and she repeatedly affirmed that she would be able to consider equally the two penalty options of life in prison and the death sentence.

Umaña argues further that despite the answers given by Juror 286, her life experiences alone should have prompted the trial court to conclude that she was impliedly biased.

"[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Person

31

v. Miller, 854 F.2d 656, 664 (4th Cir. 1988).  Implied bias might arise where there is "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."  Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).

We conclude that Juror 286's experience 30 years ago was sufficiently remote and insufficiently prejudicial to impute bias to her.  We have held that "it is generally within a trial court's discretion to qualify a juror whose close relative was a victim of a crime similar to that with which a defendant is charged, [and so] such a circumstance is not, standing alone, sufficiently 'extreme' to warrant a finding of implied bias." Fulks, 454 F.3d at 432-33 (citation omitted).  Likewise here, we conclude that it was within the district court's discretion to qualify Juror 286.

Umaña also argues that the views Juror 286 expressed about law enforcement evidenced actual bias, as indicated by the following exchange during voir dire:

Q:  [A]re you going to treat civilians and law enforcement, you're going to be able to evaluate their testimony and weigh it equally?

A:  Um, I think so.  But in all honesty, I do have to say that I do have a positive feeling towards them, police officers, detectives and so forth.

32

                    *       *       *

    Q:   [S]o you would be able to judge fairly the
         testimony of a police officer, the same way you
         would a civilian witness in this case?

    A:   I have to answer again in all honesty that I hope
         that I would be able to.  But also as I say, I do
         support and see law enforcement in a favorable
         light.

                    *       *       *

    Q:   [W]ould you follow that same instruction and use
         the same standard in evaluating the credibility
         of each type of witness?

    A:   I think so.  I've never done it before, as I say.
         I just have to say that I would hope and I would
         think that I would.

Based on these answers, Umaña contends that "Juror 286 was

equivocal about whether her beliefs about law enforcement would

interfere with her duty to treat all witnesses equally."

    Because Umaña did not, during voir dire, object to Juror

286 on this ground, we review this issue under the plain error

standard.  See Fed. R. Crim. P. 52(b); United States v. Olano,

507 U.S. 725, 732-34 (1993).

    Although "bias in favor of law enforcement officials [i]s

inappropriate," United States v. Lancaster, 96 F.3d 734, 743

(4th Cir. 1996) (en banc), we conclude that the district court

did not err in failing to find actual bias based on Juror 286's

statement that she had "positive feelings" about law

enforcement, especially where she went on to affirm (albeit in

                            33

her cautious fashion) that she would use the same standard in evaluating every witness's credibility. See Capers, 61 F.3d at 1105 (no abuse of discretion where juror said he "might" favor the government).  A juror's generally favorable impression of law enforcement does not necessarily amount to bias any more than does a juror's personal association with law enforcement. See United States v. Larouche, 896 F.2d 815, 830 (4th Cir. 1990).  Based on our review of the record, we conclude that the district court's ruling was not in error.

B

Umaña contends that Juror 119 was also biased insofar as she did not confirm during voir dire that she would "meaningfully consider life imprisonment upon a finding of guilt of the charged offenses."

On Juror 119's questionnaire, she gave seemingly contradictory answers with respect to whether she would consider life in prison for an individual convicted of racketeering offenses.  But she explained at voir dire that she had been confused by the wording of the question.  More importantly, she expressed unhesitatingly that she would consider both life in prison and the death sentence:

> Q:  [T]he question I have for you is whether you would consider those both -- those two options?
>
> A:  Oh, yes.

34

Q:   Or automatically choose one over the both?

A:   No.  No.

Q:   You would consider both?

A:   I would consider both.

Later in voir dire, Juror 119 did say that she would "lean heavily towards the death penalty for . . . intentional killing."  When the district judge followed up on this statement, Juror 119 initially expressed some equivocation, stating that she was "not sure" whether she could keep an open mind about the sentencing options.  The judge continued to probe Juror 119:

Q:   Let me ask you this question:  I'm not asking you to tell me what your decision will be.  What I'm asking you is, are you willing in good faith, to go through the process of considering and weigh both options?

A:   Yes.

Q:   As part of that, would you be willing to consider and weigh the aggravating factors presented by the government and the mitigating factors presented by the defendant?

A:   Yes.

Q:   Would you be able to follow the Court's instructions on those points?

A:   Yes.  I would have to.

The judge concluded that Juror 119 "could in good faith weigh both options."

We conclude that the judge did not abuse his discretion. In making his judgment, he followed the instructions from Hager precisely, following up with a series of shorter, simpler questions when the juror manifested some initial equivocation. The juror answered these questions unambiguously, making clear that she was not "irrevocably committed to imposing the death penalty." United States v. Caro, 597 F.3d 608, 615 (4th Cir. 2010).

As we have previously noted, a juror's mind need not be a blank slate. See United States v. Jones, 716 F.3d 851, 857 (4th Cir. 2013) ("Because jurors will have opinions from their life experiences, it would be impractical for the Sixth Amendment to require that each juror's mind be a tabula rasa"). "[I]f a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice." Id. (quoting United States v. Corrado, 304 F.3d 593, 603 (6th Cir. 2002)). The judge in the present case acted within his discretion in crediting Juror 119's assurances that she could follow the law and consider all sentencing options.

During the third phase of trial -- the sentence selection phase, during which the jury decided whether to impose life imprisonment without the possibility of release or the death penalty -- the government sought to prove that Umaña had committed several murders in Los Angeles in 2005. To that end, it introduced into evidence the transcript of an interrogation of Umaña, conducted by Los Angeles police detectives while he was in state custody in North Carolina. During the interrogation, Umaña placed himself at the two scenes of the Los Angeles murders, although he denied actually committing the murders. Even so, the evidence helped the government implicate Umaña in the murders because no evidence indicated that anyone but Umaña was present at the two locations, and the same gun was used to commit all of the murders.

Challenging the introduction of the transcript, Umaña contends that the statements he made during the interview were obtained in violation of his Miranda rights and, in any event, were given involuntarily, in violation of the Fifth Amendment. He bases his argument on the fact that during the interview, the Los Angeles detectives repeatedly told him that his statements would not "affect" the North Carolina case and that his statements would not "cost" him anything, when in fact they were used against him in this case.

As to his Miranda claim, the record shows that after the Los Angeles detectives read Umaña a Miranda warning in Spanish, they followed up with questions to ensure that he understood, again speaking to him in Spanish:

Detective:     Do you understand what I'm saying?

Umaña:     Yes.

Detective:     Do you want to talk about, uh, what we want to talk about here of things that happened in Los Angeles . . . freely?

Umaña:     I already told you, let's see about it.

Detective:     Okay.

Umaña:     Yes.

Detective:     Yes?  Okay. . . .

Umaña:     You will be explaining more things.

The detective who conducted this interview later testified that he thought that Umaña understood his right to remain silent and intended to waive that right.  The district court found the officer to be credible and that Umaña's response of "Yes," plus his subsequent willingness to answer questions, indicated that he did indeed intend to waive his Miranda rights and speak with the detectives.

We agree.  "To effectuate a waiver of one's Miranda rights, a suspect need not utter any particular words."  Burket v. Angelone, 208 F.3d 172, 198 (4th Cir. 2000).  A suspect impliedly waives his Miranda rights when he acknowledges that he

38

understands the Miranda warning and then subsequently is willing to answer questions. See United States v. Frankson, 83 F.3d 79, 82 (4th Cir. 1996). That is precisely what happened in this case.

Umaña contends that, in any event, his statements were extracted involuntarily, in violation of his Fifth Amendment rights, because the Los Angeles detectives said that Umaña's statements would not "cost" him anything or "affect" him. He identifies 10 such comments that occurred over the course of a two-and-one-half hour interview. For example, when asking about the Fairfax Street murders, one detective stated: "Why don't we go ahead and clear up everything in the past that you've done in Los Angeles. It doesn't cost you anything." And, referring to the North Carolina investigation, a detective stated: "We don't . . . want to affect the case here at all."

To determine whether a statement or confession was obtained involuntarily, in violation of the Fifth Amendment, "[t]he proper inquiry 'is whether the defendant's will has been overborne or his capacity for self-determination critically impaired.'" United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (quoting United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation marks omitted)). To make this determination, we consider "the totality of the circumstances, including the characteristics of the defendant,

39

the setting of the interview, and the details of the interrogation." Pelton, 835 F.2d at 1071.

We have consistently declined to hold categorically that a suspect's statements are involuntary simply because police deceptively highlight the positive aspects of confession. For example, in United States v. Whitfield, 695 F.3d 288 (4th Cir. 2012), we refused to find a confession involuntary where the police officers told the suspect that by talking to them he "would do 'nothing but help[] [himself].'" Id. at 303 n.8 (alterations in original). Similarly, in Rose v. Lee, 252 F.3d 676 (4th Cir. 2001), we held that "the cryptic promise that 'things would go easier' on [the suspect] if he confessed [did not] amount[] to unconstitutional coercion." Id. at 686; see also United States v. Rutledge, 900 F.2d 1127, 1128, 1131 (7th Cir. 1990) (finding that the statement "all cooperation is helpful" was the sort of "minor fraud that the cases allow" and did not make subsequent statements involuntary). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. Rather, we must look at the totality of the circumstances to see if Umaña was not acting of his own volition.

40

Considering the entirety of the interrogation, we conclude that Umaña's statements were made voluntarily. While the detectives' statements may have been misleading, they never amounted to an outright promise that nothing Umaña said would ever be used against him. Rather, they were akin to the cryptic encouragement we allowed in Whitfield and Rose. See also Illinois v. Perkins, 496 U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns").

Moreover, Umaña's statements and behavior during the interrogation belie any notion that he thought his statements could not be used against him. When the detectives were pushing him to confess to the Fairfax Street murders, he observed that "later on you're going to come to me with another case," obviously indicating that he knew his words could be used against him. And despite the detectives' suggestions that confessing would not "cost" him anything, Umaña never did so. His most significant "confessions" were to admit to being in the car during the Fairfax Street murders and dropping off the shooters in Lemon Grove Park. But he never admitted to committing any of the murders. To the contrary, throughout the interrogation, Umaña's statements were evasive and misleading. For example, when an officer asked, "[W]ho fired at the two dead

41

persons?," Umaña first responded, "I don't know that," and then, "Look . . . perhaps my hands, perhaps someone else's hands, perhaps Negro's hands, perhaps Chipie's hands."  At one point, he began rapping an MS-13 song to deflect the focus of the interview.  Umaña had experience in prior police interrogations, and in this case he was given a Miranda warning and acknowledged that he understood it.  We have little doubt that Umaña knew what he was doing as he played a cat-and-mouse game with detectives.

At bottom, we conclude that there simply was no evidence that Umaña thought his statements would not be used against him, and we decline to conclude that any violation of his Fifth Amendment rights against self-incrimination occurred.

VI

During the sentence selection phase of trial -- again in connection with the Los Angeles murders -- the district court allowed the government to introduce hearsay statements of MS-13 members accusing Umaña of committing the murders. Specifically, the court allowed detectives to testify at trial about their interviews with Luis Ramos, Luis Rivera, and Rene Arevalo. The court also allowed the government to introduce the transcripts of the interviews with Rivera and Arevalo.

Umaña objected to the evidence on the grounds that it (1) violated his right to confrontation under the Sixth Amendment and (2) constituted unreliable hearsay. The district court overruled the objections, holding that the Confrontation Clause does not apply to the sentence selection phase of capital sentencing and that the hearsay statements bore sufficient indicia of reliability and trustworthiness to be admissible during sentencing. Umaña now contends that the district court erred on both counts. We address each, seriatim.

A

Umaña argues that "it is clear from the Sixth Amendment's text and history, the Eighth Amendment, and the statutory requirements of the [Federal Death Penalty Act] that the right to confrontation applies throughout the sentencing phase of a

43

federal death penalty case." Recognizing that the Sixth Amendment has traditionally not been applied during sentencing, he argues that the death penalty is qualitatively different from other punishments and that application of the Confrontation Clause would enhance reliability in the determination that death is the appropriate punishment.

Courts have long held that the right to confrontation does not apply at sentencing, even in capital cases. In Williams v. New York, 337 U.S. 241 (1949), a state judge imposed the death penalty on a defendant based on (1) the evidence presented to the jury at trial, (2) "additional information obtained through the court's Probation Department," and (3) information obtained "through other sources," as authorized by state law. Id. at 242-43 (internal quotation marks omitted). The defendant challenged the constitutionality of the sentence because it was "based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal." Id. at 243 (quoting People v. Williams, 298 N.Y. 803, 804 (1949)). In rejecting the challenge, the Supreme Court noted that in modern sentencing, which seeks a punishment that fits the offender, not just the crime, the sentencing judge should be able to consider "the fullest information possible concerning the defendant's life and characteristics." Id. at 247. If that information

44

were "restricted to that given in open court by witnesses subject to cross-examination," it would become "unavailable." Id. at 250. The Court explained that "the type and extent of this information [necessary to the 'practice of individualizing punishments'] make totally impractical if not impossible open court testimony with cross-examination." Id. The Court also explained that sentencing is a highly discretionary function, which is distinct from finding guilt, where due process requires that the factfinder be "hedged in by strict evidentiary procedural limitations." Id. at 246. The Williams Court indicated that the standard is no different for capital cases, stating, "We cannot accept the contention" that "we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed." Id. at 251.

We conclude that Williams squarely disposes of Umaña's argument that the Sixth Amendment should apply to capital sentencing.

Umaña maintains nonetheless that intervening case law has eroded Williams, which he characterizes as containing "analysis of a bygone era of untrammeled judicial discretion." But he provides no authority suggesting that Williams has been overruled. To the contrary, Williams remains good law. The Supreme Court recently affirmed its viability in Alleyne v. United States, 133 S. Ct. 2151 (2013), in which the Court

recited _Williams_' holding that "the Sixth Amendment does not govern" "factfinding used to guide judicial discretion in selecting a punishment 'within limits fixed by law.'" _Id._ at 2161 n.2 (quoting _Williams_, 337 U.S. at 246). And we recently held in _United States v. Powell_, 650 F.3d 388 (4th Cir. 2011), that "a sentencing court [may] consider 'any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'" _Id._ at 392 (quoting _United States v. Wilkinson_, 590 F.3d 259, 269 (4th Cir. 2010)). Indeed, in _Powell_, we specifically rejected the claim Umaña now makes that intervening case law undermined _Williams_, holding that "[r]ecent Confrontation Clause decisions do not require us to reconsider this settled distinction between trial evidence and sentencing evidence in the hearsay context." _Id._

Moreover, Umaña's suggestion that evidence at sentencing be restricted by the Confrontation Clause would frustrate the policy of presenting full information to sentencers. As the _Williams_ Court pointed out, "Modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." 337 U.S. at 247. Indeed, this policy has repeatedly been recognized as

46

essential to sentencing "reliability."   See, e.g., Gregg v. Georgia, 428 U.S. 153, 204 (1976) (noting in the Eighth Amendment context, "We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision"); see also Woodson v. North Carolina, 428 U.S. 280, 303-05 (1976) (invalidating a North Carolina death penalty statute for failing to allow defendants to put on evidence of their particular character and the circumstances of their offense).   In United States v. Fields, 483 F.3d 313, 336 (5th Cir. 2007), the court explained:

> Where the [Supreme] Court discusses the need for reliability in the Eighth Amendment context, it is not talking about the appropriate sources for information introduced at sentencing or even, more generally, about the reliability of evidence.   It is instead focusing on (1) the need to delineate, ex ante, the particular offenses for which death is a proportionate punishment and (2) the need for the jury to be able to consider all factors (particularly mitigating, but also aggravating) relevant to choosing an appropriate punishment once the death penalty is in play.

We agree with Fields.   A policy of full information during sentencing, unrestricted by the strict rules of evidence, enhances reliability by providing the sentencing jury with more relevant evidence, whether presented by the government or the defendant.   To now impose the rigorous requirements of confrontation would not only be a setback for reliable sentencing, it could also "endlessly delay criminal

47

administration in a retrial of collateral issues." Williams, 337 U.S. at 250.

Finally, Umaña contends that the Confrontation Clause should apply to every fact that the jury finds, even during the sentence selection phase, because facts of guilt and punishment are "constitutionally significant." He argues that jury factfinding of aggravating factors during the sentence selection phase of trial "alters the legally prescribed range and does so in a way that aggravates the penalty." (Quoting Alleyne, 133 S. Ct. at 2161 n.2). We find this argument unpersuasive. During the sentence selection phase of a capital trial, the jury exercises discretion in selecting a life sentence or the death penalty, and any facts that the jury might find during that phase do not alter the range of sentences it can impose on the defendant. Under the Federal Death Penalty Act, the jury finds the facts necessary to support the imposition of the death penalty in the guilt and eligibility phases of trial. See 18 U.S.C. §§ 3591-3596. It is only during these phases that the jury makes "constitutionally significant" factual findings.

Only after finding Umaña death penalty eligible did the jury in this case consider hearsay evidence to assist it in exercising its discretion to select the appropriate sentence. During the selection phase, a jury is not legally required to find any facts. And while it may do so, such facts are neither

48

necessary nor sufficient to impose the death penalty -- they merely guide the jury's discretion in choosing a penalty. As the Supreme Court has recently explained:

> Juries must find any facts that increase either the statutory maximum or minimum because the Sixth Amendment applies where a finding of fact both alters the legally prescribed range and does so in a way that aggravates the penalty. Importantly, this is distinct from factfinding used to guide judicial discretion in selecting a punishment "within limits fixed by law." Williams v. New York, 337 U.S. 241, 246 (1949). While such findings of fact may lead judges to select sentences that are more severe than the ones they would have selected without those facts, the Sixth Amendment does not govern that element of sentencing.

Alleyne, 133 S. Ct. at 2161 n.2 (emphasis added).

Accordingly, we conclude that the Confrontation Clause does not preclude the introduction of hearsay statements during the sentence selection phase of capital sentencing. Accord Muhammad v. Sec'y, Fla. Dep't of Corrections, 733 F.3d 1065, 1073-77 (11th Cir. 2013); Fields, 483 F.3d at 337-38. The district court's holding that the Confrontation Clause did not prevent the government from introducing the hearsay statements of Umaña's coconspirators during the selection phase of sentencing is therefore affirmed.

B

Regardless of whether the Confrontation Clause applies, Umaña challenges the admission of the hearsay testimony in this case on the ground that it did not bear "sufficient indicia of

49

reliability to support its probable accuracy." Powell, 650 F.3d at 394 (quoting U.S.S.G. § 6A1.3(a)). We review the district court's ruling in this regard for abuse of discretion. See United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009).

With respect to the Fairfax Street murders, Umaña argues that the hearsay statements of Ramos, Rivera, and Arevalo -- all of whom accused him of being the shooter -- did not bear sufficient indicia of reliability. He argues that their statements were not corroborated by independent evidence; that any similarities in their statements were on "undisputed peripheral details"; that Rivera and Ramos spent a weekend in jail together before telling the same stories; that the statements were the product of police pressure; that they were contradicted in some respects by neutral observers; and that they were self-serving inasmuch as they exculpated the accusers, see Lee v. Illinois, 476 U.S. 530, 541 (1986) (noting that "accomplices' confessions that incriminate defendants" are "presumptively unreliable").

While these are all legitimate arguments, we conclude that the court had other evidence that rendered the hearsay testimony sufficiently reliable to overcome any presumption and support its discretion in admitting the evidence. First, there was undisputed ballistics evidence indicating that the same gun was used for both the Fairfax Street and Lemon Grove Park murders.

50

Umaña admitted to being at the scene of both crimes, and there is no evidence that anyone else was present at <u>both</u> murder sites. Moreover, there was strong evidence, as discussed below, linking Umaña to the Lemon Grove Park murder. Umaña attempts to explain away the significance of the ballistics match by suggesting that MS-13 members sometimes share guns, but there was no evidence that Umaña himself ever shared his gun. In addition, there was not just one accusation against Umaña by the declarants, but three. To be sure Ramos's accusation arose only after he spent the weekend in jail with Rivera, but there is no evidence that either Rivera's or Arevalo's accusations were tainted by collusion. Finally, as the district court noted, the statements themselves contained many other consistent details, such as the "make and model of car involved, the presence of crutches, the names of the other participants, the number of victims, and the specific gang signs displayed by the victims." In light of all of these circumstances, we conclude that the district court did not abuse its discretion in finding the hearsay accusations of Rivera, Ramos, and Arevalo regarding the Fairfax Street murders sufficiently reliable to admit them into evidence.

With respect to the Lemon Grove Park murder, the government introduced Arevalo's hearsay statement accusing Umaña of committing the crime. As with the Fairfax Street murders, the

51

ballistics evidence provided support for the reliability of Arevalo's accusation. Moreover, Freddie Gonzalez -- the target of the Lemon Grove Park attack who escaped -- identified Umaña in open court as the assailant. This evidence, we conclude, provided Arevalo's accusation with sufficient indicia of reliability to warrant its admission at sentencing. See U.S.S.G. § 6A1.3(a).

At bottom, we conclude that the district court did not abuse its discretion in admitting the hearsay evidence about the Los Angeles murders during the sentence selection phase of trial.

VII

Umaña next contends that the district court abused its discretion in admitting the transcripts of the detectives' interviews of Rivera, Arevalo, and Umaña himself on the ground that the transcripts included the detectives' statements vouching for the credibility of several MS-13 members during the interviews, which, he argues, amounted to improper government vouching at trial. He points out that during the course of the interviews, the detectives told Rivera, for example, "I'm kind of buying your story here," and Arevalo, "You don't seem like the guy that did that." In the interview of Umaña himself, a

detective stated that Ramos, Arevalo, and Rivera were "in jail right now for something that he did."

Umaña did not make this objection at trial, and accordingly we review it under the plain error standard. That standard requires Umaña to demonstrate (1) that the admission of the evidence was error; (2) that the error was plain; and (3) that it affected his substantial rights. Even then, we may only exercise our discretion as to whether to notice the error if it seriously affected the fairness, integrity, or public reputation of the proceedings. See Johnson v. United States, 520 U.S. 461, 466-67 (1997).

While government vouching for the credibility of its own witness is inappropriate, it is generally improper only when it comes to the jury at trial from the prosecutor's indication of his personal belief about the credibility of a witness, although it could also be improper for the prosecutor to solicit similar vouching from government witnesses. See United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993).

In this case we find no error, much less plain error. A reasonable jury would not take the detectives' comments during the interviews as vouching for the trustworthiness of the witness being interviewed, but rather as interrogation devices designed to encourage the witness to talk. Patronizing a witness with positive comments in order to uncover evidence of

53

criminal conduct, when introduced by the prosecutor in a transcript, can hardly be taken as a prosecutor's opinion that the witness was trustworthy. And admitting several such isolated comments embedded in voluminous transcripts would not in any event be plain error that affected Umaña's substantial rights.

In a similar vein, Umaña challenges as vouching a question by the prosecutor during trial to a detective who interviewed Ramos, Arevalo, and Rivera, in which he asked what was "consistent among all of the individuals [he] interviewed." We find that this question was not vouching at all, but a factual inquiry to uncover statements common among the witnesses.

For these reasons, we reject Umaña's vouching claims.

VIII

Umaña contends that the district court abused its discretion in refusing to permit him -- during the sentence selection phase -- to introduce evidence of the murders committed by his RICO coconspirators, who were also MS-13 members. He argues that the evidence was relevant to show that his own violent proclivities were not unique but rather were a "product of social conformity."

The district court applied 18 U.S.C. § 3592(a)(8), which provides for the admission of evidence in the sentence selection

phase relating to the "defendant's background, record, or character or any other circumstance of the offense that mitigate[s] against imposition of the death sentence," and concluded that evidence of other MS-13 murders was "irrelevant to his character or the circumstances of his offenses." In addition, the court concluded that such evidence would "confuse and mislead the jury." See 18 U.S.C. § 3593(c) (authorizing the judge to exclude evidence if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury").

We conclude that the district court did not abuse its discretion. It is difficult to imagine that giving the jury evidence of unrelated murders by MS-13 members would contribute to the individualized decision of whether to impose the death penalty on Umaña. Indeed, it might even work against him, linking him with a number of other unrelated murders. Moreover, whatever benefit Umaña might have obtained from introducing such evidence was already available to him from evidence in the record. For example, an MS-13 member testified that he had once acted as a lookout while another MS-13 member "robbed two drunk Hispanic guys," and one of the victims "was shot dead" during the robbery. Another MS-13 member testified about the activities his clique engaged in: "Sell drugs, rob people, try to kill people." A detective testified that MS-13's motto was

55

"Mata, Violar, Controla," which translates to "Kill, Rape, Control." Finally, the jury had a copy of the indictment, which listed many of the murders about which Umaña wanted to submit evidence.

The district court was appropriately concerned that if Umaña tried to prove these murders during sentencing, the process would amount to mini-trials that would take days and distract the jury. In excluding this evidence, the court acted well within its discretion.

IX

Umaña contends that during closing argument in the sentence selection phase of trial, the prosecutor made a number of improper statements to the jury that were sufficiently prejudicial as to require reversal of the death penalty verdict. See United States v. Scheetz, 293 F.3d 175, 185-86 (4th Cir. 2002). But Umaña objected to only one of the statements when made at trial, and therefore we will review the others for plain error. See United States v. Woods, 710 F.3d 195, 202 (4th Cir. 2013); United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995).

A

The statement that Umaña objected to was the prosecutor's comment to the jury about Umaña's attempt to bring a concealed shank (tied to his penis) into the courtroom. The prosecutor

56

argued that Umaña tried to bring in the shank "to fight off rivals. . . . You know who the rivals were? They're the Marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival. He brought it on the first day of jury selection." (Emphasis added). The court sustained Umaña's objection, and the prosecutor continued the closing argument thereafter making a different point -- that Umaña's rival was "justice."

Umaña contends that the prosecutor's statement that "you're his rival" was improper because it encouraged the jurors to abandoned their role as "neutral adjudicators" and become "interested parties." See United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994); see also Caro, 597 F.3d at 626. We agree. The prosecutor's statement portraying the jurors as Umaña's rivals was improper. Indeed, the government concedes that it was "ill-advised."

Nonetheless, we conclude that it was not so prejudicial as to deprive Umaña of a fair sentencing trial. The comment was isolated and did not constitute a pervasive theme throughout the closing argument. Moreover, its effect could only be minimal in light of the fact that Umaña did indeed try to bring a shank to the jury selection proceeding, which likely influenced the jurors more than did the prosecutor's statement. In addition, we think that, in light of Umaña's attempt to bring the shank to

57

the jury selection, the prosecutor's comments were, to some degree, invited.

In sum, while the remark was inappropriate, we do not believe that it was so prejudicial as to call into question the integrity of the jury's death sentence. The jury found every aggravating factor beyond a reasonable doubt, making it unlikely that the isolated comment was material to its decision.

B

The other comments made during the government's closing argument that Umaña challenges were not objected to when made, and therefore we review them under the plain error standard.

Umaña contends that the prosecutor misleadingly compared him to other MS-13 members with the following comment:

> Let's bring something back to the front here and that's that this defendant is compared with other MS 13 members according to what they would have you believe, because all those MS 13 members were framed and formed and created out of El Salvador.
>
> *       *       *
>
> So let's compare him to the people around him and quit taking him out and separating him and looking at him as if he is only this way because of factors. He's here because of who he is. And he's a killer. He's shown it over and over and over again. And he's a killer among killers. They talk about killing, yeah. But we haven't had any evidence of it. And of all the people that were around him, he was the killer. He rose to the top as the killer.
>
> *       *       *
>
> He's the only killer.

58

Umaña argues that it was improper for the prosecutor to refer to him as the "only killer" in MS-13 when he was not permitted to put on evidence to the contrary.

First, as we have already concluded, the district court acted within its discretion in refusing to allow Umaña to submit additional evidence regarding murders committed by other MS-13 members. Moreover, Umaña misreads the statement, "He's the only killer." When taken in context, the government clearly could not have meant that Umaña was the only member of MS-13 who had committed murder. Indeed, shortly before making that statement, the prosecutor stated that Umaña was a "killer among killers." (Emphasis added). Finally, there was ample evidence before the jury that other MS-13 members committed murders, as we have already summarized.

We conclude that the statement can reasonably be taken only as commenting that among the MS-13 members in the RICO conspiracy charged in the case, Umaña was the only one who pulled the trigger in the Salinas brothers' murders. If the statement was error, it was not plain error, nor did it affect Umaña's substantial rights.

C

Umaña claims next that the prosecutor made the following improper comment:

59

But you know what we heard today from one of their witnesses? There are only 240 MS-13 members in prison. And I can promise you that if one of them was there for life and was behaving, we would have heard all about it.

Umaña notes that the district court had earlier denied his motion to obtain data from the Bureau of Prisons regarding the behavior of incarcerated MS-13 members. Nonetheless, he obtained the evidence he wanted when he called as a witness a retired warden for the Bureau of Prisons who testified that MS-13 is not considered an especially serious security risk in the prison environment. Understood in that context, the prosecutor's statement was just a critique of this testimony, and we find nothing improper about it.

D

Next, Umaña objects to the prosecutor's comment made during closing argument that "[y]ou want to bring El Salvador here. . . . [Y]ou'd better be ready for some American justice." He argues that the statement "invoked an us-versus-them theme" that did nothing more than encourage "[r]acial prejudice." The government argues that the comments were not inappropriate in view of the fact that Umaña's mitigation case turned on his upbringing in El Salvador, and therefore it was appropriate to "urg[e] the jury to  hold him to American standards of justice."

60

We cannot agree that the comment that Umaña should be "ready for some American justice" responds to Umaña's mitigation case that his impoverished El Salvadoran upbringing was responsible for his criminality. But the statement was isolated in only a small part of the prosecutor's closing argument. Moreover, any prejudice that the statement may have caused was likely dwarfed by the racial prejudice Umaña himself incited in letters he had written from prison evincing strong anti-American rhetoric. For example, one letter in evidence claimed that "2012 and 2013 . . . are when these little Americans are going to be humiliated by all Hispanics from Central America, South America, and Latin America, especially by prisoners, drug dealers, mafias, and gangbangers."

Finally, the district court instructed the jury that national origin could not play a part in its verdict, and each juror certified in writing that it had not.

As such, even if the error was plain, we conclude that it did not affect Umaña's substantial rights.

E

Next, Umaña challenges the following prosecutorial statement made during closing argument:

> [I]f you give him life, [he] is going to have his inmate bill of rights. . . . He took lives. Are you going to give him his bill of rights? Manuel and Ruben didn't have a bill of rights.

61

      \*      \*      \*

> They cease to become living, breathing humans and
> became a corpse. Well, they're a corpse. And they're
> a corpse and you're going to send him to the dining
> hall. Is that justice?

Umaña argues that this statement improperly compared the plight of the victims with life in prison, thus making light of a term of life imprisonment without the possibility of release.

We do not believe that it was error, much less plain error, for the prosecutor to have compared Umaña's potential prison sentence with the plight of the victims. In United States v. Runyon, 707 F.3d 475, 513 (4th Cir. 2013), the prosecutor "made a number of comments contrasting the criminal justice system's treatment of [the defendant] with [the defendant's] treatment of [the victim]." We declined to find such comments to be improper, noting that "it is, of course, perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy." Id. In Runyon, we thought that "the whole matter represent[ed] the sort of thrust and parry in which attorneys typically engage in the course of their last chance to persuade a jury." Id. We reach the same conclusion here.

F

Finally, Umaña challenges the prosecutor's use of religious imagery during the course of closing argument. When discussing

62

Umaña's letters, sent while he was in prison, the prosecutor said:

> This [letter] is called -- it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil. It goes like this:
>
> > "One more day has now begun and I thank the beast that we keep on standing here with a joint of weed and a fully loaded gun, ready and prepared to go out into the streets like I have always planned. . . ."

Umaña argues that, in these comments, the prosecutor was "compar[ing] [him] to 'the devil.'"

To be sure, we have condemned "religiously charged arguments as confusing, unnecessary, and inflammatory." Bennett v. Angelone, 92 F.3d 1336, 1346 (4th Cir. 1996). In this case, however, prejudice could hardly have occurred, as Umaña's conduct amply invited reference to the devil. When he was in the courtroom, he "threw" MS-13's gang sign -- the horns of the devil. Moreover, he had tattoos of devilish figures on his body. And, of course, his prison letters -- including the one that the prosecutor read immediately after she made the beast comment -- contained vivid imagery evoking the devil. While it might have been better not to make so explicit or direct an allusion to the devil and its place in Umaña's heart, we cannot conclude that, in context, the comment so prejudiced Umaña as to affect his substantial rights.

63

In sum, we conclude that the prosecutorial statements made during closing argument either were not error or, if they were, were not sufficiently prejudicial to require vacating the death penalty verdict.

X

Umaña next challenges the district court's decision to allow the government to prove "future dangerousness" as a nonstatutory aggravating factor during the sentence selection phase of the trial. He argues that, in the prison context, the jury can never make a prediction about future dangerousness on any reliable basis. He points to several empirical studies by Mark Cunningham, his defense expert, who reported a lack of correlation between future dangerousness findings and actual prison violence.

We have, however, previously rejected this precise argument, holding that whether a defendant would pose a danger to others while in prison is a proper question for the jury. See Hager, 721 F.3d at 200. As we said in Hager, "Perhaps we might someday be presented with a case in which we are persuaded that the evidence presented as to a defendant's future dangerousness was merely speculative or that it was constitutionally infirm." Id. Like in Hager, we conclude that this is not such a case. Indeed, there was ample evidence presented in this case to allow the jury to find that Umaña was

64

likely to commit criminal acts of violence in the future, even in prison, and that he would constitute a continuing and serious threat to the lives and safety of others.

With respect to this aggravating factor, Umaña also challenges the structure of the verdict form because it allowed the jury only to indicate that it had found the particular subfactors and did not give the jury an opportunity to indicate whether or not they had found the "overarching aggravator" of future dangerousness. Umaña argues that this created a "presumption" of future dangerousness upon finding any one of the subfactors.[1]

---

[1] The form that the district court submitted to the jury for the purpose of finding the aggravating factor of future dangerousness appears as follows:

Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a. The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.

Yes: _____      No: _____

b. The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his

We disagree with Umaña's reading of the form. To be sure, we think that the form would have been clearer had the introductory language ended after the first two lines and had each lettered paragraph thereafter begun with future dangerousness language. But the form as used did not create any presumption, as Umaña argues. Rather, it presented the jury with four specific factual circumstances of future dangerousness on which the government presented evidence. The form was not designed to permit the jury to find future dangerousness except by finding one or more of the specific facts evidencing future dangerousness. And, of course, the form permitted the jury to find a fact evidencing future dangerousness only if they were unanimous and the fact was proved beyond a reasonable doubt.

---

pattern of criminal conduct, and his allegiance to and membership in MS-13?

Yes: _____    No: _____

c. The defendant has never expressed any remorse for killing Ruben Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?

Yes: _____    No: _____

d. The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes: _____    No: _____

Umaña argues that he should have been allowed to submit evidence regarding the impact that his execution would have on his wife and child. This argument, however, is squarely foreclosed by our decision in Hager, 721 F.3d at 194 ("[A]llowing a capital defendant to argue execution impact as a mitigator is improper").

XII

Umaña next contends that his death sentence violated the Eighth Amendment because he was only convicted of "second degree murder." He points out that the verdict form in this case reflected a finding that he committed murder, but not an additional finding that he did so with "premeditation and deliberation." He therefore argues that the jury's finding of guilt was sufficient to "establish only a conviction for second degree murder." Moreover, he maintains that there is a "national consensus . . . against death as a punishment for second degree murder." He explains that because second degree murder is "unpremeditated malice killing," it is "not well suited to capital punishment" because such murders cannot be deterred by the death sentence. Finally, he asserts that only nine States "authorize death for the second degree murders that occurred here."

The death-qualifying conduct that the jury found in this case was (1) that Umaña murdered the Salinas brothers in aid of racketeering for the purpose of maintaining or increasing his position in a racketeering enterprise, in violation of § 1959(a)(1); (2) that he used a firearm in relation to a crime of violence resulting in the deaths of the Salinas brothers and that the killings were done "with malice aforethought," in violation of § 924(c) and (j)(1); and (3) that he killed the two brothers and attempted to kill another person "in a single criminal episode." The jury also found that the other criteria for imposing the death penalty, as contained in the Federal Death Penalty Act of 1994, were satisfied in this case. The question raised by Umaña's challenge is whether the death penalty, which is authorized by these statutes, is an excessive or cruel and unusual punishment for the conduct found by the jury, as prohibited by the Eighth Amendment.

"[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" Kennedy v. Louisiana, 554 U.S. 407, 419 (2008) (alterations in original) (quoting Weems v. United States, 217 U.S. 349, 367 (1910)). To ensure proportionality, "capital punishment must 'be limited to those offenders who commit a narrow category of the most serious

68

crimes and whose extreme culpability makes them the most deserving of execution.'" Id. at 420 (quoting Roper v. Simmons, 543 U.S. 551, 568 (2005)) (internal quotation marks omitted). As such, States and the federal government must "limit the class of murderers to which the death penalty may be applied." Brown v. Sanders, 546 U.S. 212, 216 (2006). This limiting function is generally accomplished when "the trier of fact . . . convict[s] the defendant of murder and find[s] one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." Tuilaepa v. California, 512 U.S. 967, 972 (1994). The Supreme Court has also recognized several "categorical restrictions on the death penalty." Graham v. Florida, 560 U.S. 48, 59 (2010). In so doing, the Court uses the following approach:

> [It] first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

Id. at 61 (quoting Roper, 543 U.S. at 563, and Kennedy, 554 U.S. at 421).

These Eighth Amendment principles do not suggest, as Umaña urges, a categorical ban on capital punishment for "second

69

degree murders." To the contrary, the Supreme Court has explicitly approved a plethora of aggravating factors that afford the jury "wide discretion" in crimes "where the victim dies." Kennedy, 554 U.S. at 440. And there is no indication by the Court that the States or the federal government must include premeditation or deliberation as a required aggravating factor. Indeed, the Court has repeatedly upheld death penalty schemes that did not require a finding of premeditation and deliberation. For instance, in Arave v. Creech, 507 U.S. 463 (1993), the statute under which the defendant was convicted defined "first degree murder" to include not only premeditated murders but also murders where, for example, (1) the victim was a fellow prison inmate or law enforcement officer, (2) the defendant was already serving a sentence for murder, (3) the murder occurred during a prison escape, or (4) the murder occurred during the commission of specified felonies. Id. at 475. In the context of that statute, the Court found sufficiently narrowing as an aggravating factor the fact that the defendant was a "cold-blooded, pitiless slayer." Id. at 472-76. Similarly, in Jurek v. Texas, 428 U.S. 262 (1976), the Court upheld the death penalty for murder that had to be deliberate but not premeditated and where the jury made a finding of future dangerousness. Id. at 269 (describing the regime). And in Tison v. Arizona, 481 U.S. 137 (1987), the

70

Court upheld the death penalty for a participant in a felony murder who had not actually committed the murder. The Court held that the defendant's "substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an 'intent to kill.'" Id. at 154. In short, there is no suggestion that capital punishment is appropriate only for murders involving premeditation and deliberation.

In the same vein, a survey of state statutes reveals a lack of any national consensus that premeditation and deliberation are necessary to qualify a defendant for the death penalty. Most state statutes that divide murder into degrees include in "first degree murder" more than just premeditated murders. The overwhelming majority include felony murders and make them punishable by death without any showing of premeditation.[2] And

---

[2] On our review of the 22 States that divide murders into degrees, 17 make felony murder without premeditation a capital crime. See Ariz. Rev. Stat. Ann. § 13-1105; Ark. Code Ann. §§ 5-10-101 to -102; Cal. Penal Code §§ 189, 190; Colo. Rev. Stat. §§ 18-3-102, -1.3-1201; Del. Code Ann. tit. 11, § 636; Idaho Code Ann. §§ 18-4003 to -4004; La. Rev. Stat. Ann. § 14:30; Miss. Code Ann. § 97-3-19; Neb. Rev. Stat. § 28-303; Nev. Rev. Stat. § 200.030; N.H. Rev. Stat. § 630:1; N.C. Gen. Stat. § 14-17; Okla. Stat. tit. 21, §§ 701.7, 701.9; S.D. Codified Laws §§ 22-16-4, -6-1; Tenn. Code § 39-13-202; Wash. Rev. Code §§ 10.95.020-.030; Wyo. Stat. Ann. § 6-2-101.

And in the 10 States that do not include degrees, all 10 provide for capital punishment for felony murder absent any premeditation. See Ala. Code § 13A-6-2; Ga. Code Ann. § 16-5-1;

there are numerous examples of other types of murder, for which the penalty may be death, that do not require premeditation or deliberation.[3]  The principle that may be derived from these state statutes is that capital murders are not defined solely by premeditation and deliberation, but rather by elements that make those murders particularly heinous.

The federal statutes applicable in this case follow the national consensus.  Section 1959 authorizes the death penalty for murder that aids racketeering enterprises, and § 924(c) and (j)(1) authorize the death penalty for committing murder with malice aforethought, as defined in 18 U.S.C. § 1111(a), while using a firearm during and in relation to a crime of violence. The Federal Death Penalty Act further narrows the circumstances where the death penalty may be imposed by requiring that the jury find that the defendant had the requisite intentional mens rea, 18 U.S.C. § 3591(a)(2), and that at least one statutory

---

Ind. Code §§ 35-42-1-1, 35-50-2-3; Ky. Rev. Stat. Ann. § 507.020; Mont. Code Ann. § 45-5-102; Ohio Rev. Code Ann. § 2903.01; Or. Rev. Stat. §§ 163.095, .105, 115; S.C. Code Ann. §§ 16-3-10 to -20; Tex. Penal Code § 19.03; Utah Code Ann. § 76-5-202.

[3] E.g., Ariz. Rev. Stat. Ann. § 13-1105(A)(3) (classifying as first degree murder the unpremeditated, intentional killing of a police officer in the line of duty); Ark. Code Ann. § 5-10-101 (making it a capital crime to cause the death of a child less than 14 years of age while exercising extreme indifference to human life); Nev. Rev. Stat. § 200.030(1)(c) (defining as murder in the first degree murders committed to avoid arrest).

aggravating factor existed, id. § 3593(d). The jury found the conditions satisfied in this case, including that Umaña had engaged in multiple killings. See id. § 3592(c)(16).

In light of the flexibility the Supreme Court affords lawmakers in determining the aggravating factors that define capital murders, Kennedy, 554 U.S. at 440, and because there is no nationwide consensus requiring premeditation or deliberation as required predicates for the imposition of the death penalty, we conclude that §§ 1959(a)(1) and 924(c),(j)(1), in concert with the Federal Death Penalty Act, impose sufficient narrowing criteria to satisfy the Eighth Amendment.

Umaña contends alternatively that even if the death penalty is not categorically barred as a punishment for the crimes of which he was convicted, it was nonetheless excessive in the particular circumstances of this case. This argument merits minimal discussion. The jury found that Umaña killed two people in furtherance of a racketeering enterprise, and that he had killed before and posed a danger in the future. We conclude that the death penalty was proportional to the crimes for which Umaña was convicted.

XIII

Finally, Umaña contends -- with respect to the claim he made to the district court that he is mentally retarded and

therefore should not receive the death penalty -- that the government should have borne the burden of proof. He does not challenge the merits of the district court's findings with respect to his claim of mental retardation. Rather, he argues that since his interest in the issue is a "matter of life and death," see Atkins v. Virginia, 536 U.S. 304 (2002) (holding that the death penalty is inappropriate for mentally retarded defendants), the government should have borne the burden to prove him competent and, because it did not carry the burden, he should not have received the death penalty.

We conclude that Umaña cannot now make this argument. He argued below that he had the burden of proof on the issue, and any error that he now claims was invited by him. In his motion for a pretrial hearing on mental retardation, he stated:

> Because Defendant's court-appointed neuropsychologist has obtained a full-scale IQ result of 66, it appears that there is a substantial possibility that Defendant will ultimately be able to carry his burden of establishing by a preponderance of the evidence that he is mentally retarded and thus ineligible for the death penalty.

(Emphasis added). This statement by Umaña that he bore the burden of proving mental retardation was not an errant mistake. In two other motions requesting a hearing on mental retardation, he included citations to various district court cases describing the procedure for such hearings, which included the following parenthetical: "finding that question of mental retardation

74

should be resolved by the judge at a pretrial hearing, and burden should be on defendant by preponderance of the evidence." Moreover, at the hearing itself, the district court stated at the outset that the burden would be on Umaña to prove mental retardation by a preponderance of the evidence, and Umaña did not object. He cannot now complain that the district court followed the very procedure that he requested. See United States v. Lespier, 725 F.3d 437, 449-51 (4th Cir. 2013).

In any event, we conclude that Umaña correctly stated the law in representing to the district court that he had to carry the burden of proof on the issue. When a defendant seeks to show that he is mentally retarded, he is putting on an affirmative defense that would preclude execution, see Walker v. True, 399 F.3d 315, 326 (4th Cir. 2005), and defendants may constitutionally be made to bear the burden of proof for affirmative defenses, see Leland v. Oregon, 343 U.S. 790, 799 (1952) (holding, in the context of a capital case, that States may require defendants to bear the burden of proving insanity beyond a reasonable doubt); see also Patterson v. New York, 432 U.S. 197, 210 (1977) ("Proof of the non-existence of all affirmative defenses has never been constitutionally required").

Umaña now argues that, as a matter of due process, the government must bear the burden of proof on mental retardation, citing United States v. Bush, 585 F.3d 806, 814 (4th Cir. 2009),

75

where we held that the involuntary administration of antipsychotic drugs to restore a defendant's competence for trial required the government to prove the relevant factors by clear and convincing evidence.  See also Addington v. Texas, 441 U.S. 418, 431-33 (1979) (concluding that the government's proof must meet a "clear and convincing evidence" standard for civil commitment).  These cases, however, are inapt comparisons.  When the government seeks to involuntarily commit or medicate a defendant, it is not presenting an affirmative defense but attempting to infringe on the individual's constitutionally protected liberty interests.  See Sell v. United States, 539 U.S. 166, 177-79 (2003); Addington, 441 U.S. at 425.

Umaña also argues that a finding of mental retardation was an Apprendi element of his capital offense, which would alter the prescribed range of sentences to which he was exposed and, therefore, be the government's responsibility to prove.  See Alleyne, 133 S. Ct. at 2160.  But we rejected this precise argument in Walker, where we stated:

> [T]he finding of mental retardation does not increase the penalty for the crime beyond the statutory maximum -- death.  Rather, a defendant facing the death penalty may avoid that penalty if he successfully raises and proves by a preponderance of the evidence that he is mentally retarded.  The state does not have a corollary duty to prove that a defendant is "not retarded" in order to be entitled to the death penalty.  Accordingly, "an increase" in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease.

76

399 F.3d at 326 (citations omitted).  When a defendant raises mental retardation as an issue, its resolution can only <u>decrease</u> the sentence to which the defendant is exposed, and the <u>Apprendi</u> line of cases is therefore not applicable.  <u>See</u> <u>In re Johnson</u>, 334 F.3d 403, 405 (5th Cir. 2003) ("[N]either <u>Ring</u> and <u>Apprendi</u> nor <u>Atkins</u> render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt.  As the state points out, the absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense" (citation omitted)).

We accordingly reject Umaña's argument that the government had the burden of proving the absence of mental retardation in order for him to receive the death penalty.


                              XIV

Umaña has presented numerous issues in challenging his conviction and sentence, each of which has been fully presented in his fulsome brief and at oral arguments to the court.  After having carefully considered each of his arguments, as well as the record in this case, we conclude that Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper


                               77

influence of passion, prejudice, or any other arbitrary factor.

Accordingly, we affirm his conviction and sentence.

<u>AFFIRMED</u>

GREGORY, Circuit Judge, dissenting:

The majority opinion denies Mr. Umaña the right to confront his accusers in a jury proceeding to determine whether he lives or dies. The right to confront one's accusers is a right as old as it is important. Cf. Acts 25:16 ("[I]t is not the Roman custom to hand over anyone before they have faced their accusers..."). The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him" "in all criminal prosecutions." U.S. Const. amend. VI. It also guarantees the right to an attorney, jury factfinding, notice of the crimes of which a defendant is accused, and a trial in the venue where the crime was committed. Id.

The last four of these Sixth Amendment rights -- counsel, jury, venue, and notice -- are not at issue today, nor are they controversial. During Federal Death Penalty Act ("FDPA") proceedings, a defendant cannot be sentenced to death without these Sixth Amendment rights. However, under the majority's holding today, capital defendants are denied the right to confront their accusers throughout certain stages of an FDPA proceeding. In contravention of the history and text of the Confrontation Clause, and in spite of modern Supreme Court jurisprudence emphasizing the importance of the Confrontation Clause, the majority strips Umaña of the Sixth Amendment right

79

most important for ensuring the accuracy of trial outcomes during the most important proceeding of his life.

This is an important constitutional question that the Supreme Court has not yet resolved, though three circuits have wrestled with the issue. See Muhammad v. Sec'y, Fla. Dep't of Corr., 733 F.3d 1065 (11th Cir. 2013) (finding that Confrontation Clause does not apply to capital cases after guilty verdict); Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002) (same); United States v. Fields, 483 F.3d 313, 324–338 (5th Cir. 2007) (same); Proffitt v. Wainwright, 685 F.2d 1227, 1252-53 (11th Cir. 1982) (finding a right to cross examine the author of a psychiatric report under the Sixth Amendment during sentencing) modified, 706 F.2d 311 (expressly limiting case to psychiatric reports).[1] This is an issue of first impression in this circuit, though we have held that the Confrontation Clause

_____

[1] In addition, district courts have addressed this issue, reaching conflicting results. Four district courts have found that the Clause applies. See United States v. Stitt, 760 F. Supp. 2d 570, 581-82 (E.D. Va. 2010); United States v. Sablan, 555 F. Supp. 2d 1205 (D. Colo. 2007); United States v. Mills, 446 F.Supp. 2d 1115, 1127-1129 (C.D. Cal. 2006); United States v. Green, 372 F.Supp.2d 168, 175 (D. Mass. 2005). Another district court found that the right applies, but this decision was vacated. United States v. Jacques, 768 F.2d 684, 698–700 (D. Vt. 2011) vacated by United States v. Jacques, 684 F.3d 324, 330 (2d Cir. 2012). Two district courts have found that the right applies only during the eligibility phase of sentencing, which is the second stage of FDPA trials. See United States v. Jordan, 357 F. Supp. 2d 889, 903 (E.D. Va. 2005); United States v. Bodkins, CRIM.A. 4:04CR70083, 2005 WL 1118158 (W.D. Va. May 11, 2005).

does not apply in non-capital sentencing. United States v. Powell, 650 F.3d 388, 392-93 (4th Cir. 2011).

"Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment." Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion). I would refuse to strip a defendant of the Confrontation Clause right -- a right whose "very mission . . . is to advance the accuracy of the truth-determining process in criminal trials" -- at a proceeding in which a jury must decide whether a man lives or dies. United States v. Inadi, 475 U.S. 387, 396 (1986) (internal quotation marks and citations omitted). Accordingly, I dissent.

I.

I begin with some of the factual background that provides the foundation for my reasoning. First, one must understand the unique structure of FDPA trials, which illustrates that the Confrontation Clause should not disappear simply because a defendant is accused of a crime at a later stage of his judicial proceedings. Second, one must understand the nature of the accusations made in this particular case. Mr. Umaña was

sentenced to death largely based on unconfronted testimony that was as damning as it was dubious.

The FDPA requires three jury findings before a criminal defendant can be killed by the federal government. First, the defendant must be found guilty of a death-eligible crime. 18 U.S.C. § 3591. Second, a factfinder must decide whether one of several aggravating factors exists. The factors that make a defendant eligible for death are listed by statute. 18 U.S.C. § 3593(e). Third, if such an aggravating factor is found, the factfinder must finally decide whether all aggravating factors outweigh all mitigating factors. Id. Unless the factfinder makes the requisite findings in each of the three stages, death is not within the permissible range of sentences.

In this case, the district judge trifurcated the proceedings so that each of the above steps was conducted separately. J.A. 3224. In the second phase, the government only sought to prove that Mr. Umaña met two statutory aggravating factors: an attempt to kill more than one person in a single criminal episode, and the knowing creation of a grave risk of death to more than one person. J.A. 2631; see 18 U.S.C. § 3592(c)(5), (c)(16). In the third phase, the government sought to prove four more aggravating factors. J.A. 3543–45. Most relevant in this case, and what ultimately became the keystone of the government's argument, was whether Mr. Umaña had been

involved in other acts of violence not reflected in his criminal record, specifically two separate incidents of murder in Los Angeles. J.A. 3544. The primary evidence for these crimes was a series of transcripts of police interrogations in which accomplices of Umaña who were with him during the first of two Los Angeles murder incidents claim that Umaña was the only member in their group who fired a weapon that killed two teenagers. Umaña had no opportunity to cross-examine these witnesses.

The FDPA provides a set of safeguards that applies to evidence at capital sentencing, though constitutional safeguards also apply. See Estelle v. Smith, 451 U.S. 454, 462–63 (1981). While evidence presented need not comport with the entirety of the Federal Rules of Evidence, information must nonetheless be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593; accord Fed. R. Evid. 403. In addition, the FDPA explicitly provides for rights echoing those of the Sixth Amendment. The FDPA requires that the government attorney give notice of the specific aggravating factors that will be used to justify a death sentence. Compare § 3593(a) with U.S. Const. amend. VI ("[T]he accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."). The defendant is given the right to a jury. Compare § 3593(b)

with U.S. Const. amend. VI ("[T]he accused shall enjoy the right to a speedy and public trial, by an impartial jury."). However, the statute is silent on other Confrontation Clause rights. See generally 18 U.S.C. §§ 3591-99. Importantly, the fact that the FDPA is silent on certain constitutional rights does not mean that those rights do not exist or that the Act is unconstitutional. See United States v. Fulks, 454 F.3d 410, 437–38 (4th Cir. 2006); United States v. Sampson, 486 F.3d 13, 22–23 (1st Cir. 2007).

Finally, in addition to understanding the structure of FDPA trials, it is important to emphasize that the unconfronted testimony used against Umaña was as critical to the government's case as it was inherently suspect. In Bruton v. United States, a co-defendant's accusation against the defendant was introduced as evidence by a separate witness. 391 U.S. 123, 124 (1968). In finding a violation of the Confrontation Clause, the Court noted that accusations from co-defendants facing punishment for the same crime are not only "devastating to the defendant but their credibility is inevitably suspect . . . given the recognized motivation to shift blame onto others." Id. at 136. A review of the record in this case demonstrates both how "devastating" and how "suspect" such accusations can be. Id.

First, the accusations were devastating: the government made the evidence of multiple previous murders the centerpiece

84

of its case for the death sentence. Nearly every page of the transcript of the government's summation argument in the third phase of the trial focuses on these unconfronted accusations of murder. See, e.g., J.A. 3402 ("[Umaña] had killed before"); J.A. 3403 ("[Umaña] had earned those two letters on his forehead and he earned them by killing"); J.A. 3404 ("[Umaña] . . . had killed before. And he was going to kill again."); J.A. 3405 (claiming to jury that Umaña thought "I've done this before. I know what I have to do."); J.A. 3406 (claiming to jury that Umaña thought "I know they were dead because I know what dead is. I've killed before."); J.A. 3407 ("We know he's killed before."); J.A. 3408 ("Does that [previous murder] story sound familiar? . . . Sure it sounds familiar because that's exactly what happened later in Greensboro."); J.A. 3409 (arguing that Umaña thought to himself, "I'm Wizard from MS-13. We need to go out and we need to take care . . . of the people in [Lemon Grove Park]. And that's exactly what he did."); J.A. 3411 (pointing to "the two that you heard a lot of evidence on, the two additional – the three additional murders").

The record also reveals that the accusations, though "devastating," were "suspect." Bruton, 391 U.S. at 136. For the first Los Angeles murder incident, in which a group of MS-13 members exited a car to shoot two teenagers who had flashed rival gang signs, there is conflicting eyewitness evidence on

85

Umaña's role. Two eyewitnesses with no role in the altercation stated to police that the shooter was the driver of the car. However, three of Umaña's fellow gang-members who were in the car with him claimed that Umaña was the shooter, but also stated that Umaña was not the driver. Thus, for this murder allegation, the only evidence linking Umaña to the crime was given by three potential co-defendants with a strong incentive to push the blame onto Umaña. Neutral eyewitnesses, meanwhile, suggest that Umaña was not the shooter.

The only other inculpatory evidence for these two murders is from Umaña himself. Police officers from Los Angeles who were investigating these murders interviewed Umaña in North Carolina after Umaña had been arrested for the murder of the Salinas brothers. These officers told Umaña that he might as well admit to the Los Angeles murders because, given that he was facing a mandatory life sentence for the North Carolina murders, it would make no difference if he claimed responsibility for the prior crimes. After denying that he was responsible for the prior murders at length, Umaña eventually gave in to the interrogation, albeit with an equivocal, unclear statement:

> Officer: Did you shoot him? Tell me, tell me face to face. Did you shoot him?
>
> Umaña: Say that, that I did it. Right? I really didn't do it, right?
>
> Officer: You did it?

Umaña: To say it like that.

Officer: No. Not just to say it, but to say the truth . . .

Umaña: To say the truth?...[laughs]

Officer: You did it? Not out of meanness, but because you thought they were, were gang members.

Umaña: Ah . . .

Officer: Is that right?

Umaña: Yes. . . . And that is[,] that is the point that mattered to him? [Laughs]?

J.A. 4382–83.

Umaña was also linked to a third murder that occurred in Lemon Grove Park. Two pieces of evidence link Umaña to this crime. First, the same gun was used in this murder as was used in the previous Los Angeles murders, at which Umaña was present. This evidence is weak in light of expert testimony during trial suggesting that MS-13 gang members share their firearms as a matter of course. That said, Umaña admits to having been present at both murders, which gives more weight to the fact that the same murder weapon was used. However, while "there is no evidence that anyone else was present at both murder sites," Maj. Op. at 51, there were apparently one or two dozen people at the scene of the second murder, and the identities of these people are unknown. Thus, Umaña was present at both murders, but it is speculation to conclude that no one else was as well.

87

In addition to this circumstantial evidence, there is weak eye-witness evidence that implicates Umaña in the Lemon Grove Park murder. The witness, a member of a rival gang, twice picked Umaña out of a photo lineup. In 2005, the witness chose Umaña's picture out of a six-person photo lineup, but only concluded that "I remember seeing this guy but I'm not sure if he is the one that came that day to the park." J.A. 4060. Three years later, the witness again picked Umaña's picture out of a lineup, but again expressed uncertainty, noting that "I'm not 100% sure," because "everything happened so fast." J.A. 4057. The witness clarified that "what I saw was the gun and after that I began to run." Id. This witness testified during sentencing, where he noted that the shooting occurred after 9 p.m. on a basketball court where the overhead lights had been turned off. Thus, while Umaña has been linked to another Los Angeles murder, the best evidence of this link is from a witness who saw the shooter from twenty feet away at night with at best partial lighting. Further, this witness admitted that he only saw a gun before taking off running in the opposite direction. This witness has never been able to make an identification nearing 100% certainty.

Finally, and most problematic, the government introduced evidence linking Umaña to murders in El Salvador, even though this evidence had been ruled as inadmissible and even though

Umaña had no chance to confront his accusers. At sentencing, the government sought to introduce evidence that Umaña had committed violent crimes, including homicide, in El Salvador. Specifically, the government wanted to call an El Salvadoran prosecutor to testify. The district court denied the government's motion, concluding that the evidence "lacks sufficient indicia of reliability" and that "its probative value is outweighed by a danger of unfair prejudice." J.A. 3232.

Incredibly, in spite of the district court's clear ruling, the government introduced a transcript as evidence in which a United States law enforcement officer is quoted as saying "I know he's done stuff in El Salvador," J.A. 4301, "[w]e know . . . that they were looking for you for homicide also in El Salvador," J.A. 4316, and "[w]e know that he's, he's a violent, violent guy. We know that he's wanted in El Salvador . . . for many violent crimes . . . I know he's a shooter. I know he's an enforcer. I know he's a gangster," J.A. 4315. Through an evidentiary back door left wide open, the government snuck in testimony that "lacked consistency and credibility," per the district court, but had enough prejudicial value that the government made its entire case at sentencing about Umaña's past uncharged homicidal conduct.

In sum, the evidence linking Umaña to previous murders was as powerful as it was problematic. For both the Los Angeles and

89

El Salvador murders, there was not enough evidence for prosecutors to bring a case or sustain a conviction in stage one of an FDPA trial. Unfazed, the government simply bided its time until the third stage of the trial, when, per the district court's ruling and the majority opinion today, important constitutional safeguards disappear. Umaña filed a timely objection at sentencing, arguing that his Sixth Amendment rights were violated.

## II.

Turning to the merits, an understanding of the history and purpose of the Confrontation Clause, as well as an analysis of the Supreme Court's recent jurisprudence on the Confrontation Clause and Sixth Amendment factfinding, shows that the government violated Umaña's constitutional rights when he was sentenced to death without a chance to confront his accusers. District courts cannot dodge the constitutional guarantee of confrontation by splitting a capital trial into three segments and waiting until the third segment to strip a defendant of his Sixth Amendment rights. Further, because the Sixth Amendment right at issue here – the right of cross-examination – is "the constitutionally prescribed method of assessing reliability," Crawford v. Washington, 541 U.S. 36, 62 (2004), it is especially offensive to the Constitution to deny a defendant this right

90

during the very stage of the proceedings in which a jury must decide whether he deserves to live or be killed.

I begin with the text of the Sixth Amendment, but conclude that the words themselves do not settle the matter. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Because the FDPA did not exist at the time of the founding, the Sixth Amendment is silent on the distinction between different stages of FDPA trials. While the right applies to all criminal prosecutions, the text does not give guidance on when a criminal prosecution ends.

An analysis of the history leading to the Sixth Amendment is more helpful. The historical developments that led to the Confrontation Clause weigh in favor of its application at all stages of FDPA trials. In the leading case on modern Confrontation Clause doctrine, the Supreme Court explained that the Confrontation Clause right "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." Crawford, 541 U.S. at 54. The FDPA sentencing regime did not exist at the time of the founding, nor was there an analogous system. Rather, at the time when the Confrontation Clause was crafted, a death sentence flowed automatically from convictions for certain capital felonies. See United States v. Fields, 483

F.3d at 370 (Benavides, J., dissenting); see also 1 Stat. 112–19 (defining a series of federal crimes and mandating a death sentence upon conviction for certain capital crimes); Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Fordham Urb. L.J. 347, 360-65 (1999). Thus, there was no separate hearing to determine whether death was appropriate. See Woodson, 428 U.S. at 289 (1976). When capital trials are structured in this way, no defendant receives a death sentence after a trial in which he is denied the Confrontation Clause right, nor is any defendant sentenced to death on the basis of unconfronted accusations of prior crimes. "By the time the Bill of Rights was adopted," "the jury determined which homicide defendants would be subject to capital punishment by making factual determinations." Ring, 536 U.S. 599 (quoting Walton v. Arizona, 497 U.S. 639, 710–11 (Stevens, J., dissenting)). These factual determinations could only be made in proceedings in which the Confrontation Clause applied in full force. Thus, at the time of the founding, there was no exception to the Confrontation Clause right for capital sentencing.[2]

---

[2] In non-capital sentencing, meanwhile, hearsay testimony was often used and proceedings were more informal, suggesting a distinction between capital and non-capital sentencing. John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L. Rev. 1967, 2016–17 (2005).

Crawford lends further support to the idea that, based on the purpose of the Confrontation Clause, the right to confront adverse witnesses extends to every stage of an FDPA trial. In discussing the history of the clause, the Supreme Court noted that the common law right to confrontation developed in response to abuses in certain infamous trials in England. In these notorious cases, defendants were convicted, and sometimes executed, without the right to examine their accusers. Crawford, 541 U.S. at 43–45. One of "[t]he most notorious instances" of such abuses occurred in the treason trial for Sir Walter Raleigh. Id. at 44. In concluding that a judge's reliability ruling cannot substitute for the right to confrontation, the Court noted that "[i]t is not plausible that the Framers' only objection to the trial was that Raleigh's judges did not properly weigh [reliability] factors before sentencing him to death. Rather, the problem was that the judges refused to allow Raleigh to confront [the key government witness] in court." Id. (emphasis added). Thus, part of the reasoning motivating Crawford was the desire to reject any interpretation of the Confrontation Clause which would lead to the same abuses seen in the Raleigh trial. Further, the Court emphasized that what made that infamous case so odious was the lack of a confrontation right before Raleigh was sentenced to death.

Mr. Umaña now finds himself in the same position as Raleigh, stripped of his right to confront face-to-face those whose words would condemn him to die. Powerful accusations were made against Umaña, and though these accusations were not the basis for the initial guilty verdict, they ultimately helped form the basis for his capital sentence. Further, like Raleigh, Umaña lacked the opportunity to confront his accusers before the death sentence was issued. The distinction between the cases is that Sir Walter Raleigh was sentenced to death after a unitary proceeding in which guilt and penalty were decided simultaneously. In Umaña's case, meanwhile, the judge trifurcated the trial and ensured that any constitutional protections had been severed by the time of stage three, in which a jury weighs whether death is the appropriate sentence. If the judicial proceeding that led to Sir Walter Raleigh's execution is unconstitutional, as it no doubt is, then it is unclear why the same situation would lead to a different result merely because the court artificially cabins the proceeding in which the constitutional abuse occurs.

Recent Supreme Court case law on Sixth Amendment rights in sentencing further buttresses this view. In Ring v. Arizona, the Supreme Court considered whether the right to jury factfinding applies for aggravating factors necessary to apply a death sentence, which would be the equivalent of the second stage of

94

an FDPA trial. 536 U.S. at 608–09. The Court held "that the Sixth Amendment applies to" this stage of death sentencing: defendants have the right to jury factfinding for such factors. Id. at 609. Granted, Ring does not control here, since this case concerns the introduction of unconfronted testimony in the third stage of FDPA trials. The majority finds this distinction key, arguing that once a defendant is found death-eligible in stage two of an FDPA trial, "the jury exercises discretion in selecting a life sentence or the death penalty, and any facts that the jury might find during that phase do not alter the range of sentences it can impose." Maj. Op. at 48–49. This is incorrect. Under the FDPA, a jury cannot impose a death sentence until it finds that "all the . . . aggravating factors found to exist sufficiently outweigh all the mitigating factors." 18 U.S.C. § 3593(e). Only when a jury finds that aggravating factors sufficiently outweigh the mitigating factors may it impose a death sentence under the FDPA. Thus, while stage three of FDPA trials involves some jury discretion, juries must nonetheless make certain factual findings in this final stage before a death sentence can be imposed.

Put another way, the jury's burden in stage three – a finding that the aggravating factors sufficiently outweigh the mitigating factors – "is not optional." Green, 372 F. Supp. 2d at 177. "Because we will never know exactly how each factor

influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors – together – be considered legally essential to the punishment." Id. As in Green, "the government's argument that non-statutory factors are not essential is disingenuous; if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?" Id. In this case, the proof is in the pudding: the government pointed to the past murders on nearly every page of the transcript of its closing argument at sentencing. Without these past murders, it is doubtful that the government could meet the burden necessary to apply the death penalty under the FDPA. As such, the permissible range of sentencing is increased in this stage, indicating that Sixth Amendment rights do apply. See also Sablan, 555 F. Supp. 2d at 1221 ("[U]nder the structure of the FDPA, it is not the finding of a statutory aggravating factor that actually increases the punishment. The fact that actually increases the punishment is the existence of all the aggravating factors found by the jury (taken together).").

The majority argues that Williams v. New York, 337 U.S. 241 (1949), a pre-Crawford, pre-Ring Supreme Court case, directly disposes of the issue before us. That case is neither on point nor persuasive, and in any event, its power is dubious in light of more recent Supreme Court jurisprudence. In Williams, the

Supreme Court upheld a death sentence that relied in part on a probation report that implicated the defendant in prior crimes. Id. at 243. The Court continues to cite Williams for the proposition that sentencing decisions contain an element of discretion and can rely on evidence that would not be admissible at trial. See, e.g., Pepper v. United States, 131 S. Ct. 1229, 1235 (2011). We have cited to Williams for the similar concept that sentencing courts "must have recourse to a much broader array of information than we allow the trier of fact to consider in determining a defendant's guilt." Powell, 650 F.3d at 391–92.

Nonetheless, Williams is not controlling, because that case is a pre-incorporation, pre-FDPA case concerning a state death sentence. That is, Williams was not a Confrontation Clause case at all, but rather a Due Process Clause case, and it considered a state capital sentencing regime, not the federal one used for Mr. Umaña. Williams, 337 U.S. at 252. Nothing in the holding of Williams dictates that the Confrontation Clause does not apply to the third stage of FDPA trials. Rather, the holding in Williams merely means that it does not offend due process for a state judge to rely on unconfronted hearsay in death sentencing. This is different from a ruling that a far more specific clause of the constitution permits a jury to rely on such evidence in a proceeding to decide whether the death sentence can be applied. Further, the decisions cited above -- concerning the Sixth

Amendment right to factfinding at sentencing, death penalty procedure, and the Confrontation Clause -- all suggest that even if Williams is not dead letter, it should not be extended to apply to FDPA proceedings on Sixth Amendment grounds.

Even though Williams is not on point, the majority nonetheless argues that its spirit is intact. That is, Williams embodies the idea that the Confrontation Clause should not apply because "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence." Id. at 247.

This argument is internally consistent, but it elides a far more important principle of capital sentencing, which is the need for reliability. As the Supreme Court has noted, death is such a weighty punishment and so different from a prison term that "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment." Woodson, 428 U.S. at 305 (plurality opinion). Thus, greater access to information for the sentencing court is but one principle of death sentence jurisprudence – a principle that gives way to the more important principle that a death sentence be based on accurate factfinding. Further, as discussed above, the Supreme Court has explained that "the Confrontation Clause's very mission . . . is to advance the accuracy of the truth-

determining process in criminal trials." United States v. Inadi, 475 U.S. 387, 396 (1986) (internal quotation marks and citations omitted). Taken together, the Supreme Court's parallel jurisprudence on the Confrontation Clause and on the need for reliability in death sentences demonstrates why Umaña's sentence must be reversed. Death sentences must stand on reliable ground, and the Confrontation Clause is "the constitutionally prescribed method of assessing reliability." Crawford, 541 U.S. at 62.

Further, in striking the balance between the desire for more evidence and the unquestionable need for reliability in death sentences, it is important to note that the Confrontation Clause right will not only enhance reliability – it will do so at a small practical cost, contrary to the concerns voiced by the majority. The majority frets that if we recognize Mr. Umaña's Sixth Amendment rights through each stage of an FDPA trial, we would "'endlessly delay criminal administration in a retrial of collateral issues.'" Maj. Op. at 48 (quoting Williams, 337 U.S. at 250). To the contrary, the Confrontation Clause applies only to testimonial evidence, and would only be implicated in a narrow range of aggravating factors, suggesting that recognizing Mr. Umaña's Sixth Amendment right will not "endlessly delay criminal administration of collateral issues." Maj. Op. at 48 (quoting Williams, 337 U.S. at 250). As recognized in Crawford, the Confrontation Clause only reaches

"material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Crawford, 541 U.S. at 51. Even testimonial evidence continues to be admissible so long as the defendant has a prior chance to cross-examine the witness and the witness is unavailable. Id. at 51–52. Thus, the vast majority of the evidence in Mr. Umaña's case, and in most FDPA trials, would be unaffected by recognizing Mr. Umaña's Sixth Amendment right. Only for a narrow range of aggravating factors, related to uncharged prior crimes, would the Confrontation Clause be implicated, and even then only some of the time.

In any case, given that the prosecution made Mr. Umaña's uncharged prior crimes the centerpiece of its capital case in the final stage of his FDPA trial, I cannot accept the majority's conclusion that the unconfronted evidence used against Mr. Umaña was a mere "collateral issue[]." To the contrary, the government's entire case for the death penalty relied on the accusation that Umaña "had killed before." J.A. 3404. In sum, Mr. Umaña's Sixth Amendment right to confrontation provides enormous benefits in terms of reliability in capital sentencing, and this benefit comes at a small cost – limiting only very specific types of aggravating information.

The majority supports its ruling by pointing to "the policy of presenting full information to sentencers," Maj. Op. at 47, but this reasoning creates an evidentiary loophole that turns FDPA trials upside-down. Unquestionably, a sentencing court must have access to information not relevant to guilt in order to ensure that punishments are individualized. While this general proposition is valid, applying it blindly in this case is problematic because it lumps together evidence like a defendant's 4th grade report card with evidence of murder. In a typical criminal trial, the most serious crime gets proven at a guilt trial, where the full panoply of constitutional and evidentiary rights apply. In the later sentencing stages, softer evidence, both negative and positive, is introduced, to allow for individualization of punishment. This structure makes sense: the more serious an allegation, the more serious the protections given to a defendant.

Under the majority's ruling, this structure is flipped. It would have been outrageous for the government to convict Umaña for the North Carolina murders without giving him his Sixth Amendment rights. Yet, the centerpiece of the government's case for the death sentence was a series of uncharged murders that were in many ways more serious than the North Carolina incident. The third stage of an FDPA trial is typically reserved for evidence about the victims' families or about the defendant's

elementary school performance or Boy Scout record. The jury must weigh these soft, more subjective factors to fit the punishment to the crime. The evidence we consider here is so much more severe than a 4th grade report card that it is different in kind, not degree. When a jury considers a Boy Scout record, the truthfulness and reliability of the evidence is a secondary matter at best. The more difficult task for this type of information is fitting it into a cohesive, complete picture of the defendant. The weight to be accorded to the evidence is the predominant inquiry, and its reliability is a lesser concern. In contrast, when a jury considers evidence of three additional murders, the reliability of the evidence is the predominant concern, whereas the weight to accord such evidence is much easier to discern. That is, it is easy to know how much weight to accord evidence of past murders because it completely overwhelms evidence like an elementary school report card, as the government's closing argument demonstrates. Instead, for this type of evidence the most important inquiry is as to its truth and reliability. This distinction again shows why the district court committed legal error. The government is essentially exploiting the district court's ruling to have a second murder trial, only without the restrictions that the Supreme Court mandated in Crawford and Ring. The majority's ruling today lets the tail wag the dog, and it will encourage

strategic posturing by prosecutors to punish defendants for crimes that could never be found beyond a reasonable doubt by a rational factfinder.

III.

The majority today strips a defendant of his Sixth Amendment right to confront his accusers. Further, it denies this right in a proceeding in which a jury must decide whether a human being is fit to live. In this, the most momentous decision a jury can make, the majority would do away with the "constitutionally prescribed method of assessing reliability" of evidence. Crawford, 541 U.S. at 62.

Umaña is being sent to his death based on accusations by self-interested accomplices – self-interested accomplices whose testimony, at least in part, was contradicted by independent witnesses. This illustrates the Supreme Court's admonition that accusations from co-defendants facing the same punishment are "devastating to the defendant." Bruton, 391 U.S. at 136. "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." Id. Because I conclude that the Confrontation Clause applies at every stage of an FDPA trial, not just the first two stages, and because I conclude that it is both wrong and unconstitutional

103

for a death sentence to rest on unconfronted accusatory evidence, I dissent.